**LONGVIEW REFINING COMPANY and Crystal Oil Company, Defendants-Appellants,**

v.

**W. R. (Bill) SHORE, d/b/a Shore Oil Products, et al., Plaintiffs-Appellees,**

**Independent Terminal Operators Association, Amicus Curiae.**

No. 5–17.

Temporary Emergency Court of Appeals.

Argued Nov. 22, 1976.

Decided Feb. 15, 1977.

Donald B. Craven, Miller & Chevalier, Washington, D.C., with whom Louis Paine and Thomas W. Houghton, Butler, Binion, Rice, Cook & Knapp, Houston, Tex., and Thomas W. Hathaway, Hathaway & Jackson, Tyler, Tex., were on the brief for appellants.

Jack N. Price, Price & Williams, Austin, Tex., on the brief for appellees.

William H. Bode and William C. Lane, Jr., Batzell, Nunn & Bode, Washington, D.C., were on the brief for amicus curiae.

Before INGRAHAM, VAN OOSTER-HOUT, and ESTES, Judges.

ESTES, Judge.

Plaintiffs-appellees, W. R. (Bill) Shore and 12 other separate parties,[1] are purchasers of gasoline and diesel fuel from one or more refineries, which products each of them resells to and through service stations

---

1. The plaintiffs-appellees are:
   1. W. R. (Bill) Shore, d/b/a Shore Oil Products
   2. J. C. Duke Oil Company
   3. J. S. Hackler
   4. Martin & Son, Inc.
   5. Mitchell Oil Company, Inc.
   6. Pete Roberts
   7. T. C. Rosser
   8. J. C. Bell
   9. Matthews Oil Company
   10. Bob Hodge
   11. M. I. Dickey, Jr., d/b/a B. & M. Oil Company

for retail distribution to consumers. Defendant-appellant Longview Refining Company (Longview) operates a small refinery which has been a supplier of gasoline and/or diesel fuel for the respective plaintiffs at various periods of time. Defendant-appellant Crystal Oil Company acquired all of Longview's capital stock as of November 1, 1973.

The plaintiffs sought declaratory and injunctive relief and monetary damages for certain actions allegedly committed by defendants: (1) violations of the Economic Stabilization Act of 1970, as amended (Stabilization Act), 12 U.S.C. § 1904 note (1976 Supp.),[2] and the Emergency Petroleum Allocation Act of 1973, as amended (Allocation Act), 15 U.S.C. § 751 ·et seq. (1976 Supp.), and regulations thereunder; (2) violations of the Sherman and Clayton Acts; and (3) violations of the parties' supply contract and the termination provisions of Article 2.309(c) of the Texas Business and Commerce Code, V.T.C.A. Bus. & C. § 2.309(c) (1968).

The plaintiffs' original complaint was filed December 27, 1973.[3] On May 7, 1974, the district court ordered the plaintiffs' first cause of action to be severed and advanced on the trial docket. The trial on the severed cause of action was held December 9–11, 1974.

Findings of Fact and Conclusions of Law were filed by the district court on January 22, 1976, and judgment was rendered February 23, 1976, for the plaintiffs against the defendants for $518,053.71, with interest from the date of judgment, attorney's fees to be determined following any appeal from the judgment, and all costs of court. On March 17, 1976, the district court granted the defendants' motion for a stay of execution of the judgment pending appeal to the Temporary Emergency Court of Appeals (TECA).[4] Defendants filed a notice of appeal with this court on March 23, 1976.

Finding the judgment entered February 23, 1976, by the district court on plaintiffs-appellees' severed cause of action to be non-appealable without proper certification by the district court in accordance with Federal Rule of Civil Procedure (FRCP) 54(b), this court entered an order on June 24, 1976, dismissing the defendants-appellants' appeal. Acting upon plaintiffs' motion, the district court entered an order on August 10, 1976, dismissing the antitrust claims contained in the second and third causes of action (Sections IV and V of the Plaintiffs' Complaint) without prejudice to refiling. Based on that order's making the February 23, 1976 judgment final pursuant to the requirements of 28 U.S.C. § 1291, defendants filed a notice of appeal in this court on

12. John H. Roberts
13. Thriftyman, Inc.

**2.** The Economic Stabilization Act of 1970, as amended (Stabilization Act), 12 U.S.C. § 1904 note (1976 Supp.), expired on April 30, 1974, pursuant to § 218 of that Act. The alleged violations of regulations and orders issued pursuant to the Stabilization Act purportedly occurred during the existence of the statute, so this case falls within the § 218 saving clause of the Stabilization Act. See *Carpenters 46 County Conference Board v. The Construction Industry Stabilization Committee*, 522 F.2d 637 (Em.App.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1724, 48 L.Ed.2d 194 (1976); *United States v. California*, 504 F.2d 750 (Em.App. 1974), *cert. denied*, 421 U.S. 1015, 95 S.Ct. 2423, 44 L.Ed.2d 684 (1975); *State Trial Attorneys Association v. Flournoy*, 522 F.2d 1406 (Em.App.1975).

**3.** In the first cause of action in the original complaint [Appellants' Brief Appendix (Br. App.) pp. 6–18], the plaintiffs alleged violations of the Stabilization Act alone, since the regulations promulgated pursuant to the Emergency Petroleum Allocation Act of 1973 (Allocation Act), 15 U.S.C. § 751 *et seq.* (1976 Supp.), enacted November 27, 1973, had not been issued. Plaintiffs' Fifth Amended Complaint (Br. App. pp. 45–58) filed July 15, 1974, alleges, *inter alia*, violations of the Allocation Act regulations which became effective January 15, 1974 (39 F.R. 1924).

**4.** Under § 211(b)(2) of the Stabilization Act, the Temporary Emergency Court of Appeals (TECA) has exclusive appellate jurisdiction of all cases arising under the Stabilization Act. Section 5(a)(1) of the Allocation Act, which adopts § 211 of the Stabilization Act, grants the TECA exclusive appellate jurisdiction over all cases arising under the Allocation Act, under regulations promulgated pursuant to § 4(a) of that Act, or under any action taken by the President or his delegate under that Act.

September 7, 1976.[5] Since the plaintiffs' motion requested dismissal of the contract claims, the antitrust claims, and the claims against Atlantic Richfield Company and since the third cause of action contained in Section V of the Plaintiffs' Fifth Amended Complaint expressly deals with supply contract violations, the contract claims and those against Atlantic Richfield Company were dismissed. There being no further claims or causes of action in the district court, this court has jurisdiction over this appeal.

There are two basic periods of time during which the plaintiffs paid the defendants prices which allegedly constituted overcharges under the Stabilization Act and the Allocation Act. These two periods are: (1) the entire freeze period from June 13, 1973, through August 19, 1973;[6] and (2) that portion of the pricing formula period from November 1, 1973, through February 28, 1974.[7] The defendant Longview Refining Company allegedly overcharged the plaintiffs during the first freeze period, and Longview Refining Company and Crystal

Oil Company allegedly overcharged the plaintiffs during the pricing formula period, November 1, 1973, through February 28, 1974.

In essence, plaintiffs' cause of action was based upon assertions: (1) that the defendant Longview Refining Company's charges to plaintiffs for gasoline and diesel fuels during the freeze period, from June 13 to August 19, 1973, were higher than the maximum allowable price under Executive Order No. 11723, June 13, 1973, 38 F.R. 15763 (June 15, 1973), as extended through August 19, 1973, at 38 F.R. 21933 (August 14, 1973), resulting in an overcharge to plaintiffs;[8] and (2) that the defendants subsequently failed to comply with the Phase IV pricing formula established by the Cost of Living Council (CLC) at 6 CFR §§ 150.355–356 and continued by the Federal Energy Office (FEO), sometimes referred to in this opinion as Federal Energy Administration (FEA), in 10 CFR §§ 212.82–83, resulting in additional overcharges to the plaintiffs.[9] Asserting that the overcharges were willful and intentional on the part of the defend-

---

**5.** As we indicated in *Spinetti v. Atlantic Richfield Company*, 522 F.2d 1401, 1403 (Em.App. 1975), this court does not have jurisdiction over claims such as the antitrust and contractual claims made in the plaintiffs' complaint. Cf. *Associated Gen. Con., Okl. Div. v. Laborers Int. U., Loc. 612*, 489 F.2d 749, 751 (Em.App.1973); *United States v. Cooper*, 482 F.2d 1393 (Em. App.1973), approved in *Bray v. United States*, 423 U.S. 73, 96 S.Ct. 307, 46 L.Ed.2d 215 (1975).

**6.** On January 11, 1973, President Nixon issued Executive Order No. 11695, 38 F.R. 1473 (January 12, 1973), which instituted the largely voluntary Phase III price control program. Since sufficient stabilization of the economy was not being achieved under Phase III, the President imposed a comprehensive price freeze on sales prices of all services and commodities, except raw agricultural products, for a maximum period of 60 days. Executive Order No. 11723, June 13, 1973, 38 F.R. 15763 (June 15, 1973). The 60-day freeze period scheduled to expire on August 12, 1973, was extended to August 19, 1973. 38 F.R. 21933 (August 14, 1973). Phase IV controls commenced on July 18, 1973. Executive Order No. 11730, 38 F.R. 19345 (July 19, 1973).

**7.** The pricing formula regulations issued under Phase IV of the Stabilization Act became effec-

tive August 19, 1973. 38 F.R. 22536 (August 22, 1973). The basic price rule for refiners originated at 6 CFR § 150.355, 38 F.R. 22536 (August 22, 1973), and the allocation of increased costs to the price of covered products sold by refiners was provided for in 6 CFR § 150.356. Numerous changes and amendments were made. (See Appendices A, B, and C to this opinion.) Subsequently, new regulations were promulgated by the Federal Energy Office (FEO) under the authority of the Allocation Act, 10 CFR §§ 212.82–83, 39 F.R. 1924 (January 15, 1974).

**8.** Plaintiffs contended that they did not learn about the freeze period overcharge until the discovery phase of this suit, so they sought recovery of those overcharges in addition to recovery due to overcharges resulting from the pricing formula violations. (Br. App. p. 51). Neither the quantity of the plaintiffs' purchases from Longview during the freeze period nor the dollar amount of any claimed overcharge during the freeze period is alleged in the complaint.

**9.** The plaintiffs did not state the amount of any overcharge during the pricing formula period in their original or in any of their amended complaints. Plaintiffs' Exhibit 6 sets forth overcharge calculations first on the basis of month-

ants, the plaintiffs sought treble damages under Section 210 of the Stabilization Act.[10]

The district court found that defendant Longview intentionally and willfully overcharged during the freeze period the amount of $73,027.59. Apparently, the district court accepted the calculations of plaintiffs' CPA witness, Mr. Sanders, that the total overcharge was $.0125 x 5,842,207, i. e., the overcharge per gallon multiplied by the total gallonage of regular gasoline, premium gasoline, and diesel fuel purchased by plaintiffs June 13 through August 19, 1973.[11] According to Mr. Sanders, the $73,-027.59 figure represents the total overcharges for all of the plaintiffs except one who did not provide his purchases for that period.[12]

In addition, the district court found that the plaintiffs had proved the defendants willfully violated the Phase IV pricing formula, 6 CFR § 150.356, and the Allocation Act's pricing formula, 10 CFR § 212.-83(c)(2).[13] The court accepted Mr. Sanders' calculation in Plaintiffs' Exhibit 6(b) that the overcharge through February, 1974,

ly reports and second on the basis of more recent figures supplied by defendants prior to trial. Under the former, the net overcharge by defendants was $500,815.00, of which plaintiffs' portion would be $100,466.15. Under the latter, plaintiffs calculated a total net overcharge of $243,505.00, with their portion being $91,964.96.

After cross-examination by the defendants' attorneys, the plaintiffs recalculated the figures in their exhibit and introduced Exhibit 6–A. The overcharges based on the monthly reports were alleged to be $509,395.00, the plaintiffs' share being $169,235.17. Using more recent figures, plaintiffs showed overcharges of $332,-452.00, their share being $163,864.20. The plaintiffs' final recalculation made in Exhibit 6–B following further cross-examination indicates overcharges of $509,395.00 based on the monthly reports, with plaintiffs' portion being $99,237.06. The more recent figures showed overcharges of $332,452.00, of which $99,-656.98 was plaintiffs' share.

10. Section 5(a) of the Allocation Act adopts § 210 of the Stabilization Act, which provides:

(a) Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction (subject to the limitations in section 211), and/or damages.

(b) In any action brought under subsection (a) against any person renting property or selling goods or services who is found to have overcharged the plaintiff, the court may, in its discretion, award the plaintiff reasonable attorney's fees and costs, plus whichever of the following sums is greater:

(1) an amount not more than three times the amount of the overcharge upon which the action is based, or

(2) not less than $100 or more than $1,000; except that in any case where the defendant establishes that the overcharge was not in-

tentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error the liability of the defendant shall be limited to the amount of the overcharge: *Provided*, That where the overcharge is not willful within the meaning of section 208(a) of this title, no action for an overcharge may be brought by or on behalf of any person unless such person has first presented to the seller or renter a bona fide claim for refund of the overcharge and has not received repayment of such overcharge within ninety days from the date of the presentation of such claim.

(c) For the purposes of this section, the term 'overcharge' means the amount by which the consideration for the rental of property or the sale of goods or services exceeds the applicable ceiling under regulations or orders issued under this title.

11. In the trial court, plaintiffs introduced the total of their freeze period purchases in aggregate form. (Plaintiffs' Exhibit 2). Defense counsel objected to this as not being proof of the actual purchases by each plaintiff. [Transcript (T.R.) pp. 40–41].

12. Plaintiff J. C. Bell's purchases were not included in either the freeze period calculations (T.R. p. 40) or the pricing formula calculations (T.R. pp. 130, 135). At trial, Bell testified that his purchases averaged around 5,000 gallons a month (T.R. p. 319) and that in the latter part of 1973 purchases ranged from a high of approximately 6,000 gallons to a low of 1,845 gallons (T.R. p. 323).

13. [Findings of Fact (F.F.) 15–24]. The plaintiffs introduced the relevant regulations (T.R. p. 70) as they were reproduced at ʳ 48,821 of the CCH Stabilization Program Guidelines for the Phase IV pricing rules. (See Appendix A, pages 48,832 and 48,833 of which were part of Plaintiff's Exhibit 6). As noted at ¶ 48,821, p. 48,830, this represents 10 CFR § 212.82 as amended at least through April 10, 1974, and at

amounted to $99,656.98. Concluding that the overcharge must be presumed to be deliberate and not the result of bona fide error, rejecting the alternative of awarding damages not less than $100 nor more than $1,000, and exercising its power to treble the amount of the overcharge, the district court ordered that the plaintiffs recover $518,053.71 [($73,027.59 + $99,656.98) × 3] with interest. [Conclusions of Law (C.L.) 15, 16].

The method for determining the existence and amount of any overcharge during the freeze and formula periods involved is different. During the freeze period, the price of covered petroleum products was required to be maintained at the level at which the seller had made at least ten per cent of the total sales to the same class of purchaser during the *freeze base period,* June 1 to June 8, 1973. Under the phase IV pricing formula which became effective at the end of the freeze period and continued under FEO regulations, the maximum allowable price was determined by reference to a complicated, changing formula which allocated refiners' increased costs to their covered products.[14]

Clearly, plaintiffs have the burden in this case to provide the specific data needed to prove the existence of an overcharge. Determining lawful prices during both the freeze period and the pricing formula period requires an interpretation of certain essential concepts and terms used in the regulations.[15] The pricing formula, 10 CFR § 212.83, is extremely complex and its application calls for expertise.[16] Thus, precise findings of fact by the district court are of paramount importance in this case.

In *Kelley v. Everglades Drainage Dist.,* 319 U.S. 415, at 419, 63 S.Ct. 1141, at 1143, 87 L.Ed. 1485, at 1487 (1943), the Supreme Court stated that "[t]he nature and degree of exactness of the findings required depends on the circumstances of the particular case." After noting facts which it would have been appropriate for the district court to consider, the Supreme Court held:

It may be that adequate evidence as to these matters is in the present record. On that we do not pass, for it is not the function of this court to search the record and analyze the evidence in order to supply findings which the trial court failed to make. Nor do we intimate that find-

¶ 48,821, p. 48,834, 10 CFR § 212.83 as amended at least through May 1, 1974. Close examination of this material and the pertinent history of the regulations contained therein reveals that the regulations introduced were not the same as those effective during the entire period in controversy.

14. In *Schirtzinger v. Dunlop,* 489 F.2d 1307 (Em.App.1973), this court noted regarding Subpart L of the Cost of Living Council (CLC) Phase IV regulations dealing with the pricing of petroleum products:
   Subsequent to oral argument of this case on September 17, [1973] the CLC has on three separate occasions significantly amended the regulations here involved  . . .
489 F.2d at 1308. Another example of the agency's changing regulations which were the subject of a pending lawsuit is *Consumers Union of U. S. v. Sawhill,* 525 F.2d 1068 (Em.App. en banc 1975). The *Schirtzinger* court examined the amendments and their effect on computation of allowable prices under the regulations. 489 F.2d at 1308–9. See Appendix B for text of changes.
   For example, the formula was revised, corrected or changed practically once a month

between September, 1973, and February, 1974. See Note 26.

15. The FEA issued Ruling 1974–17 dealing with Base Price Computation, 39 F.R. 21042 (June 18, 1974), CCH Energy Management ¶ 16,027, and Ruling 1974–18 dealing with Discounted May 15, 1973 Price to a Class of Purchaser, 39 F.R. 21042 (June 18, 1974), CCH Energy Management ¶ 16,028, on June 12, 1974. Subsequently, the FEA issued Ruling 1975–2 dealing with Application of the Term "Class of Purchaser". Under FEA Petroleum Price Regulations, 40 F.R. 10655 (March 7, 1974), CCH Energy Management ¶ 16,042, stating that "those rulings did not resolve all outstanding questions and that to some extent the rulings themselves have been misconstrued." CCH Energy Management ¶ 16,042, at p. 16,073.

16. See T.R. pp. 70–91 and 492–520. The defendants' CPA-witness testified that the cost recovery formula is very complex, that many parts are subject to multiple constructions, and that even accountants may disagree about proper application. (T.R. p. 523).

ings must be made on all of the enumerated matters or need be made on no others; . . . We hold only that *there must be findings,* stated either in the court's opinion or separately, *which are sufficient to indicate the factual basis for the ultimate conclusion.* (emphasis added)

319 U.S. at 421–422, 63 S.Ct. at 1145, 87 L.Ed. at 1489. In the case before this court, the district court's findings as to the facts relevant to the proof of any overcharges alleged in the plaintiffs' complaint are not sufficiently specific to substantiate concluding there was an overcharge by the defendants in any sum certain as to any individual plaintiff.

### Willful Overcharge

In considering the overcharges the district court found that plaintiffs paid during the freeze and formula periods, the crucial question which must be examined initially is whether the alleged overcharge was willful (in either or both periods) within the meaning of section 208(a) of the Stabilization Act. Section 210(b)(2) precludes bringing an action for an overcharge which "is not willful within the meaning of section 208(a)" unless "a bona fide claim for refund" has been presented.[17] It is undisputed that the plaintiffs did not present defendants with a claim before instituting this action; plaintiffs assert that the overcharge was willful.

Requiring presentation of a bona fide claim for refund of an overcharge is part of the congressional provision of an opportunity and an incentive for non-judicial settlement. If the person refuses to refund the overcharge within 90 days of the presentation of a claim, the injured party may bring suit pursuant to § 210 of the Stabilization Act. Under § 210(b) of that act, a defendant can be subjected to serious penalties[18] in addition to repayment of the overcharge unless the defendant "establishes that the overcharge was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error . . . ." Stabilization Act § 210(b)(2), 12 U.S.C. § 1904 note (1976 Supp.).

The district court found as to each time period involved that it was unnecessary for plaintiffs to present a claim for refund, since defendants' overcharge was willful. The finding of willfulness was based upon an erroneous conclusion that as a matter of law the "civil meaning of willfulness" controls this case. (C.L. 14). In the absence of prior presentation of a claim for refund, the overcharge must be found to be willful in the criminal sense, even though the action is itself civil. As this court stated in *Manning v. University of Notre Dame du Lac,* 484 F.2d 501, 503 (Em. App.1974):

> The Act clearly reveals in this context that the term "willful overcharge" must be construed in the criminal sense.

Pure statutory construction clearly supports the *Manning* holding. Also, the district court concluded that section 210 of the Stabilization Act "is essentially civil in nature." (C.L. 14) This conclusion ignores the express language of section 210 requiring the overcharge to be "willful within the meaning of section 208(a)." From the face of section 208, there can be no doubt that

---

**17.** Section 210(b)(2) of the Stabilization Act is adopted by § 5(a) of the Allocation Act and provides, *inter alia:*

> That where the overcharge is not *willful within the meaning of section 208(a)* of this title, *no action for an overcharge may be brought* by or on behalf of any person *unless such person has first presented to the seller or renter a bona fide claim for refund* of the overcharge and has not received repayment of such overcharge within ninety days from

the date of the presentation of such claim. (emphasis added).

See Note 10, above, for more complete text of Stabilization Act § 210. The Act does not excuse failure to present a claim for refund simply upon a conclusion that it would have been futile.

**18.** See Note 10, above, for the text of § 210(b) of the Stabilization Act providing penalties which a court may award in an action brought under § 210(a) of that Act.

section 208(a) is essentially criminal in nature.[19]

Since the section 208(a) criminal meaning of willful governs in section 210 of the Stabilization Act, two district court decisions in criminal actions brought under the Act are pertinent. Facing the issue of whether the predecessor of section 208(a) was civil or penal in nature, the district court in *United States v. Futura*, 339 F.Supp. 162, 165 (N.D.Fla.1972), held the section was penal and that

> Violation of the [Stabilization] Act is predicated upon a showing or finding of *scienter*, i. e. willful disobedience of the Act or regulations by the offender.

The *Futura* court looked to the legislative history of section 208 and concluded that it revealed "that Congress did in fact intend that a crime be created and did intend to provide for criminal punishment for violation thereof." *United States v. Futura*, at 165–166. Agreeing with the *Futura* court that "§ 208(a) criminal penalties were written with an eye to scienter," the district court in *United States v. Gulf Oil Corp.*, 408 F.Supp. 450, 463 (W.D.Pa.1975), decided that

> The Congress in enacting § 208(a) of the Economic Stabilization Act, intended that those refiners who, with bad motive or criminal intent, refused to comply with the regulations passed pursuant to the Act, would thereby be subjected to criminal fines.

Further examination of legislative history substantiates this court's conclusion that the criminal rather than the civil meaning of willful was intended to apply in this case. While discussing the provisions of section 210 and the requirement of presentation of a bona fide claim for refund prior to commencing an action for overcharge, the Conference Committee stated in the Joint Explanatory Statement: "The House Bill also provided that the term 'willful' shall have the same meaning as in the case of criminal willfulness. . . . The Conference accepted the House provisions." Conference Report No. 92–753, 2 U.S.Code Cong. & Adm.News, 92d Congress, 1st Sess., pp. 2307, 2310 (1971).

Cases interpreting the word "willfully" for purposes of the tax law require proof under the criminal meaning. Deciding that "willfully" had the same meaning in the context of a misdemeanor tax statute that it had in the context of a felony tax statute, the Supreme Court stated in *United States v. Bishop*, 412 U.S. 346, 360–361, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973):

> The Court, in fact, has recognized that the word "willfully" in these statutes generally connotes a voluntary, *intentional violation* of a known legal duty. It has formulated the requirement of willfulness as "bad faith or evil intent," *[United States v.] Murdock*, 290 U.S. [389], at 398, 54 S.Ct. [223], at 226 [78 L.Ed. 381,] or "evil motive and want of justification in view of all the financial circumstances of the taxpayer," *Spies [v. United States]*, 317 U.S. [492], at 498, 63 S.Ct. [364], at 368 [87 L.Ed. 418], or knowledge that the taxpayer "should have reported more income than he did." *Sansone [v. United States]*, 380 U.S. [343], at 353, 85 S.Ct. [1004], at 1011 [13 L.Ed.2d 882]. . . . In our complex tax system, uncertainty often arises even among taxpayers who earnestly wish to follow the law. . . . The Court's consistent interpretation of the word "willfully" to require an element of *mens rea* implements the pervasive intent of Congress to construct penalties that separate the purposeful tax violator from the well-meaning, but easily confused, mass of taxpayers. (emphasis added).

Upholding a jury instruction concerning willful filing of false income tax returns, the Supreme Court recently held that willfulness means "a voluntary, *intentional vio-*

---

19. "§ 208. Sanctions; criminal fine and civil penalty

(a) Whoever willfully violates any order or regulation under this title shall be fined not more than $5,000 for each violation.

(b) Whoever violates any order or regulation under this title shall be subject to a civil penalty of not more than $2,500 for each violation."

*lation* of a known legal duty." (emphasis added) *United States v. Pomponio,* 429 U.S. 10, 97 S.Ct. 22, 24, 50 L.Ed.2d 12, 16 (1976). *Pomponio* approved cases instructing the jury to the effect that intentional violation of a known legal duty must be embodied in the definition of willfulness and that negligence neither defines nor constitutes willfulness. See *United States v. Pohlman,* 522 F.2d 974, 976 (8 Cir. 1975) (en banc), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 776, 46 L.Ed.2d 638 (1976); *United States v. McCorkle,* 511 F.2d 482, 484 (7 Cir. 1975) (en banc), *cert. denied,* 423 U.S. 826, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975); *United States v. Greenlee,* 517 F.2d 899, 904 (3 Cir. 1975), *cert. denied,* 423 U.S. 985, 96 S.Ct. 391, 46 L.Ed.2d 301 (1975); *United States v. Hawk,* 497 F.2d 365, 366–367 (9 Cir. 1974), *cert. denied,* 419 U.S. 838, 95 S.Ct. 67, 42 L.Ed.2d 65 (1974).

■ In the instant case, the district court's conclusion regarding a willful overcharge that

> . . . in the framework of this case, an overcharge is wilful where it is deliberate, or where it is the natural and probable consequence of actions of the defendants which are voluntary and intentional or which are in reckless disregard of the applicable regulations, as opposed to being the result of a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error (C.L. 14)

is clearly erroneous. This conclusion fails to recognize that to establish a willful overcharge there must be an intentional violation of a known legal duty, that is to say, to be willful an overcharge must have been made with the specific intention of charging a price which the defendant knew was in excess of the ceiling price allowable under the applicable pricing law and regulations. Additionally, the district court erroneously concluded that negligence can be sufficient to establish a violation. Thus, the district court decided this case on a less stringent standard of proof (civil instead of criminal willful conduct) than required by law. The findings, conclusions, and judgment were no doubt influenced by application of the wrong standard. This and other reasons discussed herein require remand to the district court for a determination of both the existence and the willfulness of any overcharge by defendants during the periods in controversy pursuant to the criminal standard of willfulness.

■ In view of the obvious complexity of the regulations with respect to which the agency found it necessary to provide extensive and necessary clarification by means of several amendments and rulings and in view of the gravity of the sanctions and penalties provided by the statutes, there must be clear and convincing proof that an overcharge was willful when a claim for the amount of the overcharge was not presented to the defendant prior to bringing an action for an overcharge.[20]

*Freeze Period*

Under the price freeze initiated by Executive Order No. 11723, "Effective 9:00 p. m., e.s.t., June 13, 1973," 38 F.R. 15763 (June 15, 1973), the prices allowable during the freeze period were the highest prices at which at least ten per cent of a seller's products were sold to the same class of purchaser during the freeze base period from June 1 to June 8, 1973.[21] The deter-

---

**20.** See *United States v. Empire Gas Corporation,* 547 F.2d 1147, (Em.App.1976). Fundamental fairness requires that the regulations be clear so that men of common intelligence need not guess at the meaning and differ as to the application. *Boyce Motor Lines v. United States,* 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952); *Brennan v. Occupational Safety and Health Review Commission,* 505 F.2d 869, 872 (10 Cir. 1974). One can have knowledge of a legal duty imposed by regulations only when there is adequate notice. When criminal sanc-

tions are involved, courts will not tolerate lack of specificity, *e. g., United States v. Morrison,* 536 F.2d 286 (9 Cir. 1976).

**21.** In Finding of Fact No. 5, the district court erroneously found that this Executive Order was effective June 15, 1973. Executive Order No. 11723, 38 F.R. 15763 (June 15, 1973), provides in pertinent part:

> On January 11, 1973 I issued Executive Order 11695 which provided for establishment of Phase III of the Economic Stabiliza-

mination of defendant's allowable freeze price for sales to the plaintiffs is complicated by whether American Petrofina should be included in the plaintiffs' class of purchasers, what prices are attributable to American Petrofina's purchases, and when the purchase transactions occurred.

Longview Refining Company historically maintained different price levels for its customers, depending primarily on the customers' purchasing characteristics; however, on May 25, 1973, a price increase was adopted which resulted in all customers paying the same price.[22] This price continued for the plaintiffs until June 7, 1973, when Longview raised its prices by $.0125. American

Petrofina (Petrofina) was billed the lower prices through June 16, 1973, when Longview issued Petrofina a debit memorandum, the effect of which was to increase prices Petrofina paid to defendants for gasoline and diesel fuel as of June 4, 1973.

Testimony by defendants' witnesses indicates that the failure to invoice Petrofina the higher price was due to clerical error and that all of defendants' customers were to be charged the higher prices at least as of June 7, 1973. Mr. Peterson, who was president of Longview Refining Company at this time, testified that Petrofina's price increase was to have been effective June 4, 1973, and that he had so agreed with Petrofina.[23]

tion Program. On April 30, 1973 the Congress enacted, and I signed into law, amendments to the Economic Stabilization Act of 1970 which extended for one year, until April 30, 1974, the legislative authority for carrying out the Economic Stabilization Program. . . . Price behavior under Phase III has not been satisfactory, however. I have therefore determined to impose a comprehensive freeze for a maximum period of 60 days on the prices of all commodities and services offered for sale except the prices charged for raw agricultural products. . . .

NOW, THEREFORE, by virtue of the authority vested in me by the Constitution and statutes of the United States, particularly the Economic Stabilization Act of 1970, as amended, it is hereby ordered as follows:

Section 1. *Effective 9:00 p. m., e.s.t., June 13, 1973,* no seller may charge to any class of purchaser and no purchaser may pay a price for any commodity or service which exceeds the freeze price charged for the same or a similar commodity or service in transactions with the same class of purchaser during the freeze base period. This order shall be effective *for a maximum period of 60 days from* the date hereof, until 11:59 p. m., e.s.t., August 12, 1973. It is not unlawful to charge or pay a price less than the freeze price and lower prices are encouraged. (emphasis added).

\* \* \* \* \* \*

Section 7. Whoever willfully violates this order or any order or regulation continued or issued under authority of this order shall be subject to a fine of not more than $5,000 for each such violation. Whoever violates this order or any order or regulation continued or issued under authority of this order shall be subject to civil penalty of not more than $2,500 for each such violation.

Section 8. For purposes of this Executive Order, the following definitions apply:

"Freeze price" means the highest price at or above which at least 10 percent of the commodities or services concerned were priced by the seller in transactions with the class of purchaser concerned during the freeze base period. In computing the freeze price, a seller may not exclude any temporary special sale, deal or allowance in effect during the freeze base period.

"Class of purchaser" means all those purchasers to whom a seller has charged a comparable price for comparable commodities or services during the freeze base period pursuant to customary price differentials between those purchasers and other purchasers.

"Freeze base period" means

(a) the period June 1 to June 8, 1973; or

(b) in the case of a seller who had no transactions during that period, the nearest preceding seven-day period in which he had a transaction.

"Transaction" means an arms length sale between unrelated persons and is considered to occur at the time of shipment in the case of commodities and the time of performance in the case of services. June 13, 1973.

22. On May 25, 1973, Longview began charging all customers $.16 for regular gasoline, $.18 for premium gasoline, and $.15 for diesel fuel. A letter dated February 8, 1974, from the defendants' counsel to the accountant testifying for the plaintiffs state that the distinctive arrangements which had previously warranted a price differential ended shortly after May 15, 1973. [T.R. pp. 51–57, Exhibits (Ex.) pp. 88–89 and 118–119, F.F. 8 at Br.App. p. 62]. The February letter states that "since June [Longview has] had only one class of gasoline purchasers." (P. Ex. 6; Ex. p. 118).

23. Defendants' position is that American Petrofina should not be included in the same class of purchaser as the jobber class to which the

The district court found that defendants had only one class of purchaser during the freeze base period and that, even assuming clerical error had occurred with respect to Petrofina's price increase, the effective date of that increase would be June 6, 1973, after Mr. Peterson issued instructions to raise the prices for gasoline and diesel fuel to all of Longview's customers. [Findings of Fact (F.F.) 7, 8, 12]. If, as the trial court found, the price increase to Petrofina were considered effective June 6, 1973, less than ten per cent of defendants' sales during the freeze base period would be at the higher prices, (F.F. 11).[24] Thus, the district court held that to the extent defendants' charges were in excess of their lower freeze base period prices of 16¢, 18¢, and 15¢ for regular, premium, and diesel fuel, respectively, defendants had violated the Executive Order and plaintiffs were entitled to recover the overcharges they had paid. The district court found that the overcharge of $73,027.59 was a willful evasion of the regulations (F.F. 13), but the court made this determination on the basis of an erroneous conclusion that the civil rather than the criminal standard of willfulness was applicable.

■ No finding of the amount of plaintiffs' individual purchases or individual overcharges in any sum certain was made as required by the Supreme Court's decision in *Kelley v. Everglades Drainage Dist.,* 319 U.S. 415, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943), and this court's decision in *Evans v. Suntreat Growers and Shippers, Inc.,* 531 F.2d 568, 571 (Em.App.1976), that

> plaintiffs belonged. Defendants' June 20, 1973 letter to the Economic Control Board (Ex. p. 61) indicates that their total gasoline sales to jobbers between June 1 and June 8, 1973, was 517,708 gallons and that of this total 56,957 gallons were at the higher prices, so more than 10% of their total sales during the freeze base period were at the higher prices which defendants continued to charge throughout the freeze period. Petrofina sales were not included in the total gasoline sales to the jobbers.
>
> Plaintiffs' position is that the debit memorandum represents a retroactive backbilling to manipulate the "freeze price." See Note 21.

Most importantly, there was no evidence of probative value in the record of any bona fide claim for refund, *in any sum certain* to apprise the appellee of any overcharge made by it. (emphasis added).

In fact, the district court did not include the purchases of one plaintiff, J. C. Bell, in the calculation of the freeze period overcharge.[25]

### Formula Period

Following the expiration of the comprehensive price freeze period, new regulations which provided for continued control of the sales prices of covered products purchased or refined by a refiner became effective August 19, 1973. 38 F.R. 22536 (August 22, 1973).

■ Proper evaluation of the existence of any overcharge during the period in controversy, November 1, 1973 through February 28, 1974, requires cognizance of numerous changes in the regulations. The ceiling price rule applicable to the retail sales of No. 2–D diesel fuel, No. 2 heating oil, and gasoline by a refiner-retailer, reseller-retailer, or retailer was promulgated as 6 CFR § 150.355. As originally issued, section 150.356 was limited to allocating a refiner's increased cost of imports to the base prices for its covered products and the ceiling prices for retail sales of gasoline, No. 2–D diesel fuel, and No. 2 heating oil. Subsequently, increased costs of domestic crude petroleum were included in the regulatory allocation, 38 F.R. 25686 (September 14, 1973), for purposes of arriving at a base price for covered products pursuant to 6 CFR § 150.355(g).[26]

**24.** By adding Petrofina's purchases to the total of the jobbers' gasoline purchases and by disregarding the retroactive billing, the defendants' total sales would amount to 626,382 gallons, with only 56,957 gallons at the higher prices. This would not represent ten per cent of the total sales from June 1 to June 8, 1973.

**25.** See Note 12.

**26.** The regulation, 6 CFR § 150.356, providing for allocation of increased costs incurred by a refiner was amended and republished several times during the fall of 1973. After its original publication in 38 F.R. 22536 (August 22, 1973),

The pricing rule for refiners, 6 CFR § 150.355, provided that a refiner could not charge any class of purchaser a price in excess of the base period price of a covered product except to the extent permitted by paragraphs (c) through (k) of § 150.355. Base price was defined in § 150.355(g)(1) as "the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, . . . plus increased costs of imports and domestic crude petroleum incurred between the month of measurement and the month of May 1973 . ." 38 F.R. 30267 (November 2, 1973). However, for the months of January and February, 1974, base price was defined by the CLC as

the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, plus (A) increased product costs incurred between the month of measurement and the month of May, 1973 and measured pursuant to the provisions of § 150.356 [§ 212.83] and (B) the refiner incentive factor calculated and permitted pursuant to the provisions of § 150.357 [§ 212.84].

6 CFR § 150.355(g)(1)(i), 39 F.R. 979 (January 4, 1974). The FEO's definition of base price at 10 CFR § 212.82(f)(1)(i) originated at 39 F.R. 1924 (January 15, 1974); and the section number changed to correspond with the FEO regulations, but the definition remained the same.

The provisions of 6 CFR § 150.356 and 10 CFR § 212.83 allowed a refiner to increase the May 15, 1973 weighted average price of a covered product by the increased product costs allocable to that product under the regulation formula. Basically, when setting the selling price of a covered product, a refiner could add to the May 15, 1973 base selling price of that product the increased crude oil purchase costs allocable to a particular product, plus the increased costs of any purchases of the product by the refiner during the previous month, plus or minus the cumulative over- or under-recovery of increased costs recoverable under 10 CFR § 212.82, minus any recoverable increased cost which the refiner is including in other covered product prices under 10 CFR § 212.-83(c)(1)(ii).

Section 212.83 contained a lengthy formula which performed the function of allocating a refiner's increased costs. The combination of § 212.83 and the price rule of § 212.82 provided a method, as did their predecessors, by which a refiner could arrive at its maximum lawful price. Generally, the scheme of 10 CFR § 212.82 (6 CFR § 150.355) during the period in controversy was that a refiner could not charge any class of purchaser a price in excess of the base price, but the base price could include increased product costs incurred during the permitted time and measured pursuant to the provisions of 10 CFR § 212.83 (6 CFR § 150.356). Thus, the § 212.83 formula delimited product costs which could be included. Mere failure of a defendant to perform the mechanical calculations under the formula in arriving at the price charged for covered products does not in and of itself result in an overcharge, i. e., the sale of a covered product at a price which "exceeds the applicable ceiling" [§ 210(c)] price. The price actually charged (however arrived at) may be below the ceiling price, so a plaintiff would suffer no legal wrong entitling him to relief under § 210 of the Stabilization

it was amended, at 38 F.R. 25686 (September 14, 1973); 38 F.R. 27290 (October 2, 1973); 38 F.R. 30267 (November 2, 1973); 38 F.R. 33577 (December 6, 1973); and 38 F.R. 35473 (December 28, 1973). Effective December 26, 1973, the chairman of the Cost of Living Council, in CLC Order No. 47, 39 F.R. 24 (January 2, 1974), CCH Stabilization Program Guidelines ¶ 48,212, delegated all price stabilization authority over petroleum products and crude oil to the administrator of the Federal Energy Of-

fice, which had been created under Executive Order No. 11748, 38 F.R. 33575 (December 6, 1973). The FEO then issued its own regulations, 10 CFR §§ 212.82–83, at 39 F.R. 1924 (January 15, 1974). During the relevant period for purposes of this suit, the cost allocation regulation, 10 CFR § 212.83 was amended at 39 F.R. 4450 (February 1, 1974); 39 F.R. 4466 (February 4, 1974); and 39 F.R. 7429 (February 26, 1974).

**1018**

Act, which was adopted by § 5(a) of the Allocation Act.

In determining the applicable ceiling price, the district court should have made a specific finding of fact as to the dollar amount of defendants' weighted average price for all gasoline and diesel fuel sold on May 15, 1973, to the class of purchaser to which the plaintiffs belonged at that time. Plaintiffs and defendants disputed the inclusion of certain purchasers of gasoline and diesel fuel in the "jobber" class of purchaser to which the plaintiffs belonged. Claiming special purchase agreements, defendants did not include certain purchasers (e. g., Petrofina) in plaintiffs' class when computing the May 15, 1973 price.[27]

In the circumstances of this case, the finding (F.F. 28) of the district court that

> [t]he proper base price as of May 15, 1973, is that which averages all transactions as of May 15, 1973, and is the base price used in the plaintiffs' calculations

is defectively general and all-inclusive in merely accepting "plaintiffs' calculations" of the base price. It omits specific findings of the dollar amount of the May 15, 1973 weighted average price for each product involved [28] as well as the actual base price figure for sales to plaintiffs' class of purchaser; and a more specific finding should have been made as to whether Petrofina and others claimed to be of a class of purchaser separate from plaintiffs' were included in plaintiffs' class.

Defendants-appellants contend that the district court erred in calculating defendants' allowable prices on an unconsolidated basis. Under the unconsolidated method a substantial overcharge was found to exist while utilization of the consolidated method "ostensibly eliminated the overcharge." (F.F. 19). Essentially, defendants claim that in the process of determining Longview Refining Company's allowable prices they have the right to consolidate Longview's increased product costs with the increased product costs of seven other refinery and marketing affiliates of Crystal Oil Company and allocate to Longview a portion of the combined companies' increased product costs based on the proportion which Longview's sales bear to the combined sales of all consolidated companies.[29]

Whether calculations may be made on a consolidated basis is inextricably bound with the question of the applicable definition of "firm" for purposes of the price regulations in 10 CFR. Subpart B, Definitions, of 10 CFR provides in section 212.31, under the definition of a firm, that:

> The FEO may, in regulations and forms issued in this part, treat as a firm: (1) a parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls, (2) a parent and its consolidated entities, (3) an unconsolidated entity, or (4) any part of a firm.

The price rules for refiners are at 10 CFR Subpart E, while marketers, i. e., resellers and retailers, are governed by 10 CFR Sub-

---

**27.** There was testimony in the trial court to the effect that the terms and conditions of sales to Allied, American Petrofina, Foremost M & A, Sun Oil Company, Exxon, and Thriftyman, Inc., were different from those of sales to the local independent jobbers such as plaintiffs purchasing from Longview. (T.R. pp. 431–438).

**28.** The plaintiffs' own CPA-witness testified that the May 15, 1973 price of the product involved was the most important figure in the formula calculations (T.R. p. 51). The district court accepted plaintiffs' calculations of the overcharge both without determining the defendants' May 15, 1973 weighted average price for regular and premium gasoline and diesel fuel and without plaintiffs' showing their calculation of the May 15, 1973 price for each fuel.

**29.** According to Finding of Fact No. 19, the affiliated companies of Crystal Oil Company, which were consolidated by defendants for the purpose of calculating the allowable price, were: Longview Refining Company, Berry Refining Company, Adobe Refining Company, Crystal-Princeton Refining Company, Hi-Octane Terminal Company, Tulsa Oil Company, and Stone's Independent Distributors. This finding would not indicate that defendants consolidated the Joe E. Hutchinson Distributing Company, although Mr. Burns' testimony at trial indicates that, in fact, the Hutchinson Company was included in the consolidation. (Ex. pp. 229–230, T.R. p. 512).

part F. At the time material to this proceeding, Subpart E provided that "[e]xcept as provided in Subpart F, this subpart applies to each sale of a covered product which is purchased or refined by a refiner." 10 CFR § 212.81. In the regulation governing refiners, Subpart E, 10 CFR § 212.83(b), the FEO specifically provided that a firm "means a parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls." On the other hand, the regulation governing resellers and retailers, 10 CFR § 212.91, stated that the provisions of 10 CFR Subpart F, Resellers and Retailers, apply:

> to each sale of a covered product (other than the first sale of crude petroleum) by resellers, reseller-retailers, and retailers, and to each sale of crude petroleum (other than the first sale) by a refiner. For purposes of this subpart, *"reseller" includes any entity of a refiner which is engaged in the business of purchasing and reselling covered products, provided that the entity does not purchase more than 5 percent* of such covered products from the refiner including any entities which it directly or indirectly controls *and provided further* that the *entity* has *historically and consistently exercised the exclusive price authority* with respect to sales by the entity. (emphasis added)

39 F.R. 1924 (January 15, 1974).

The district court concluded that the definition of reseller in § 212.91 referred essentially to those performing middleman or jobber type functions. (C.L. 8). The court

recognized that the regulation allows certain resellers which are subsidiaries of refiners to be consolidated with the refiner in a calculation of its allowable prices but determined that the definition of reseller does not apply to this case, because the retail distribution arms of Crystal Oil Company qualify as retailers, or as reseller-retailers, rather than strictly as resellers.[30] (C.L. 8, 9). Rather than determining whether the marketing entities should be excluded from treatment under 10 CFR Subpart F, Resellers and Retailers, as required by § 212.91, which provides a specific exclusion for certain firms meeting the definition of a reseller as defined in that section, the court made its determination that the marketing entities of Crystal would not meet the general definition of a reseller of 10 CFR Part 212.31, a definition which would not include a firm which resells covered products to ultimate customers. That the general definition was used is evident from the following excerpt from Conclusion of Law No. 9:

> The record fails to reveal any basis for treating them as "resellers", *i. e., firms which purchase covered products and resell them without substantially changing their form, to purchasers other than ultimate customers.* But the record, (e. g., Mr. Burns' reference to them as "retailers" and "reseller-retailers") and public disclosures, *i. e.,* the annual reports, by Crystal Oil Company, show that the named subsidiaries are retailers. Accordingly, that portion of Sec. 212.91 further

---

30. The district court stated, in Conclusion of Law No. 9, that "the retail distribution arms of Crystal Oil Company qualify as 'retailers,' and their pricing is governed by Subpart F. It matters not that the retail distribution subsidiaries might qualify as 'resellers-retailers' for the special provisions contained in Sec. 212.91 apply only to 'resellers.'" (Br.App. p. 72). Thus the court did not make a specific determination as to whether or not Crystal Petroleum Company, Joe E. Hutchinson Distributing Company, Tulsa Oil Corporation, and Stone's Independent Oil Distributors, Inc. were resellers-retailers. It merely concluded that the record failed "to reveal any basis for treating them as 'resellers.'" (C.L. 9, Br.App. p. 72).

A reseller-retailer is, under 10 CFR § 212.31, "a firm (other than a refiner) or that part of such a firm which carries on the functions of both a reseller and retailer"; whereas, under 10 CFR § 212.31, a reseller is defined as "a firm (other than a refiner or retailer) or that part of such a firm which carries on the trade or business of purchasing covered products, and reselling them without substantially changing their form to purchasers other than ultimate consumers." A retailer is defined by § 212.31 as "a firm (other than a refiner or reseller) or that part of such a firm which carries on the trade or business of purchasing covered products and reselling them to ultimate consumers without substantially changing their form." 39 F.R. 1924 (January 15, 1974).

defining "reseller" has no application. (emphasis added).

Thus, the court erroneously used the definition of reseller under Subpart B, 10 CFR § 212.31, rather than the definition of a reseller specifically set out in Subpart F, 10 CFR § 212.91, to determine the application of the exclusionary provisions of § 212.91.

FEA decisions and orders interpreting the mandatory pricing regulations promulgated by the agency make it clear that the definition of reseller contained in 10 CFR § 212.91, which definition is solely for the purposes of Subpart F, Resellers and Retailers, is intended to include the marketing entities of a firm.[31] Upholding an opinion and order requiring Puerto Rican marketing affiliates and parent refiners to be treated as a single entity under the refiner's pricing rule, the FEA stated:

As originally promulgated, the price rules also provided that a marketing affiliate of a refiner would be treated separately under the reseller pricing rule, which provides for a dollar-for-dollar pass through of increased product costs, provided that the affiliate purchased less than five per cent of the petroleum products which it marketed from its parent firm. . . . The application of the rules was not only frustrating the achievement of ". . . equitable distribution of . . . refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry . . ." (EPAA, Section 4(b)(1)(F)), but was also leading to the occurrence rather than the ". . . minimization of economic distortion . . ." (EPAA, Section 4(b)(1)(I)).

*Esso Standard Oil S. A., Ltd., Exxon Corp.,* Case No. FEA-0275 (filed 10–22–74, decided 11–14–74), 1974 CCH Energy Management Transfer Binder ¶ 20,177, at p. 20,301.

The FEA denied the exception application of the U.S. Virgin Islands marketing

branch and quoted the Interpretation requiring consolidation with domestic operations of Exxon:

Thus, a *subsidiary* of Exxon Corporation operating in the U.S. Virgin Islands *which buys more than 5 percent of its covered products from a foreign seller which is controlled by that subsidiary's* U.S. *Parent firm* (consolidated and unconsolidated, directly or indirectly controlled), *is a "refiner,"* and is required to price its product in accordance with the regulations governing refiners set forth in Subpart E of Part 212, Title 10, Code of Federal Regulations. (emphasis added)

*Esso Standard Oil S. A. Ltd.,* Case No. FEE–1025 (filed 7–30–74, decided 12–20–74), 1974 CCH Energy Management Transfer Binder ¶ 20,748, at pp. 20,964–20,965. In accord with respect to Esso Eastern Guam Branch is *Esso Eastern Inc.,* Case No. FEE–0915 (filed 6–14–74, decided 12–23–74), 1974 CCH Energy Management Transfer Binder ¶ 20,752, at p. 20,976, in which the FEA stated in reference to the definition of "firm" in 10 CFR § 212.83(b) that "Only those entities of Exxon, or any other refiner, which meet the criteria set out in Section 212.91 are subject to the reseller pricing rules." Esso Eastern had sought treatment as a reseller-retailer by arguing that it was an independent firm.

As indicated in *Esso Standard Oil S. A., Ltd., Exxon Corp., supra,* policy considerations favor consolidation. In *Getty Oil Company (Eastern Operations), Inc., Skelly Oil Company,* Case No. FEE–1101 (filed 9–11–74, decided 2–11–75), 1975 CCH Energy Management Transfer Binder ¶ 83,041 at p. 83,108, the FEA emphasized the equitable pricing objective of section 4(b)(1)(F) of the Allocation Act in its statement that "[b]y requiring a firm to combine all of the product cost increases which it has incurred for the purpose of determining its maximum permissible selling prices, the pricing

---

**31.** The great deference to be granted an agency's interpretation of its own regulations has been examined by this court many times. See *Pasco, Inc. v. FEA,* 525 F.2d 1391, 1400–1401 (Em.App.1975), and *Cities Service Company v.*

*F.E.A.,* 529 F.2d 1016, 1022–1023 (Em.App. 1975), *cert. denied* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976), and authorities cited therein.

rules applicable to refiners serve to effectuate that stated Congressional objective." The purpose of consolidating the costs which a refiner experiences across the country was to avoid imposing "any pricing anomalies that occur in a particular geographic region or on a given date . . . directly and disproportionately . . . [on] a small segment of the firm's customers. . . . " *Getty Oil Co., supra*, at p. 83,108. The FEA compared the provisions of § 212.83, which requires companies controlled by a common parent to combine their product and non-product cost increases as a single firm for the purposes of Subpart E-Refiners, in determining their maximum permissible selling prices, to the provisions of 10 CFR § 211.67, commonly referred to as the Entitlements Program.[32] *Getty Oil Co., supra*, at p. 83,108–109. Both provisions were designed to spread cost disparities among all purchasers in order to achieve equitable prices in all regions of the country. Since Getty Eastern and Skelly were controlled by a common parent, the FEA concluded they were a single firm under Subpart E, so they had to determine prices on a consolidated basis. The FEA did grant their request for exception from Subpart E consolidation.

Thus, the companies which (1) come within the meaning of firm in Subpart E and (2) are not excepted by Subpart F § 212.91 or granted exception relief by the FEA are subject to the pricing provisions of 10 CFR Part 212, Subpart E-Refiners, and should, pursuant to those regulations, combine their increased product costs with those of other affiliated entities in the same firm in determining their allowable prices.

Conclusions of Law Nos. 9, 10, and 11 are erroneous in that the four companies, Berry Refining Company, Adobe Refining Company, Crystal-Princeton Refining Company, and Hi-Octane Terminal Company, which are either refiners or treated as refiners, were not consolidated to the extent permissible in calculating defendants' ceiling prices under the regulations.[33] On remand, facts regarding acquisition and operation of the various companies must be taken into account in calculating defendants' ceiling prices on a consolidated basis. Should it be determined that any or all of the non-refiner companies are subject to the exclusionary provisions contained within the definition of a reseller in Subpart F, section 212.-91,[34] defendants' consolidation of those companies for purposes of calculating the allowable price for the products sold by Longview Refining Company would be proper under Subpart E, section 212.83. See *Kerr-McGee Corporation*, Case No. FEE–0930 (filed 6–24–74, decided 9–12–74), 1974 CCH Energy Management Transfer Binder ¶ 20,-658.

The defendants-appellants contend that the district court erred by completely accepting the plaintiffs' calculations (C.L. 11) despite the fact that plaintiffs plainly disregarded specific definitions within the regulation. For example, under the price rule in 10 CFR § 212.83(c)(2), the superscript "t"

---

**32.** As stated by this court in *Cities Service Co. v. F.E.A.*, 529 F.2d 1016, 1021 (Em.App.1975), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976):

The basic purpose of the Entitlements Program was to spread the benefit of access to old price-controlled oil and the burden of dependence on uncontrolled oil among all sectors of the petroleum industry, all regions of the country, and among all consumers of petroleum products, while retaining the incentives for increased production and anti-inflationary measures which the two-tier price system provided.

**33.** As found by the district court (F.F. 22, Br. App. p. 67), Crystal Oil Company acquired Longview Refining Company on November 1, 1973, and Adobe Refining Company on November 30, 1973; and Crystal-Princeton Company was not in operation as of February, 1974. Subpart H, New Items, of the price regulations, particularly section 212.111, affects determination of the "base price." See *Coastal States Gas Corp.*, Case No. FEE–2315 (filed 3–15–76, decided 6–29–76), 1975–76 CCH Energy Management Transfer Binder ¶ 83,252. See 39 F.R. 1924 (January 15, 1974) and amendment in 39 F.R. 6530 (February 20, 1974).

**34.** There was testimony in the trial court to the effect that Tulsa Oil Company, a non-refiner, may not have met the 5% rule for two or three months and thus might not be subject to consolidation at least for those months. (T.R. p. 551). See Notes 29, 30.

means the month of measurement, which is defined as the month *preceding* the current month. In contravention of this express definition, plaintiffs' calculations were based on using the current month as the month of measurement. At trial, the plaintiffs' witness maintained that the procedure of applying the same month's sales to that month's purchases instead of the previous month's would not make a difference. As the defendants pointed out, if the formula were properly employed in this case, March revenues would be used in the plaintiffs' charts and August revenues would not be included (T.R. p. 165–166). Thus, the plaintiffs' charts are inaccurate.

Finding of Fact No. 17 completely disregards the regulations in effect as of January and February, 1974, defining base price as "the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, plus (*a*) increased product costs incurred between the month of measurement and month of May, 1973 and measured pursuant to the provisions of § 212.83 *and (b)* the refiner incentive factor calculated and permitted pursuant to the provisions of § 212.84." (emphasis added) 10 CFR § 212.82(f)(1)(i), 39 F.R. 1924 (January 15, 1974). The refiner incentive factor was in effect during January and February and applied to No. 2–D diesel fuel, *inter alia.* When properly applied, this factor affects not only the price of the No. 2–D diesel duel sold to plaintiffs,[35] but also the price of gasoline. 10 CFR § 212.82(f)(2)(i) and (ii). The refiner incentive factor should have been considered at least to the extent of

making a finding of fact as to the amount of plaintiffs' purchases, if any, of No. 2–D diesel fuel.

Also, the regulations then effective provided in Subpart E that "transactions between affiliated entities may be used to calculate increased product costs." 10 CFR § 212.83(e), 39 F.R. 1924 (January 15, 1974). Contrary to the provisions in the regulations for including the increased costs of refined petroleum products purchased by a refiner for resale, the plaintiffs' calculations did not include any costs of finished gasoline or diesel products defendants purchased from an affiliated entity. The record does not reflect that the affiliated company transactions were made at improper prices.

As to the court's finding that these overcharges must be presumed to have been deliberate,[36] the plaintiffs' CPA testified that he had previously asked the defendants' accountant, Mr. Leeseman (who was no longer employed by the defendants at the time of trial),[37] whether or not he had any calculations on the basis of the pricing formula under Phase IV regulations. According to plaintiffs' accountant, Leeseman responded that he did not have any calculations although he had read the formula because he found it beyond his understanding and consequently did not attempt to apply it. (T.R. p. 16). However, mere failure to employ the formula in the process of arriving at prices would not constitute a legal wrong under § 210 of the Stabilization Act for which plaintiffs can recover. It is intentionally charging a price known to be in excess of the applicable ceiling price al-

---

**35.** The refiner incentive factor (See Appendix C) was in effect for January and February and applied to No. 2–D diesel fuel, which basically meant that the defendants could increase their May 15, 1973 price for No. 2-D diesel fuel by two cents per gallon, the end result being that the overcharge reflected in plaintiffs' schedules would be less (T.R. p. 198). The plaintiffs' CPA testified (1) that he did not take the refiner incentive factor into account (T.R. pp. 89, 196) and (2) that he did not know whether or not the plaintiffs had purchased any No. 2–D diesel fuel (T.R. p. 199).

**36.** In Conclusion of Law No. 15, the district court stated: "[T]his is a case of total failure to follow the formula over a protracted period of time, resulting in a substantial, and what must be presumed to be a deliberate overcharge." (Br. App. p. 75).

**37.** Leeseman was responsible for pricing defendants' products through approximately mid-January, 1974. Mr. Burns, the CPA who testified for defendants at trial, was hired in late December, 1973; and from mid-January, 1974, he was responsible for providing defendants' management with prices meeting the regulations.

lowable under the pricing regulations containing the formula which would constitute a willful overcharge.[38]

It is difficult, even for experts, to understand these complex regulations, as is evidenced by the frequent correction, modification, change, and clarifying rulings and by the fact that cross-examination of plaintiffs' own CPA witness drew admissions that he had twice made substantial errors in calculating the overcharges claimed.[39] Fairness requires clear and convincing proof of the willfulness of the overcharge.

The district court erroneously inferred "from the cross-examination" of plaintiffs' CPA witness by defendants' counsel that at the material times in controversy defendants had the same understanding and knowledge of these complex regulations that their counsel had after a year's time (from commencement of this action) in which to prepare for trial.[40]

Considering the errors, inadequacies, facts, and circumstances reflected by the record, the court is of the firm conviction that a mistake has been made in the findings, conclusions, and judgment rendered and that this case should be remanded for a new trial. See *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *United States v. Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

### Joinder of Administrative Agency

The record reflects that the Cost of Living Council, the Internal Revenue Service, the Federal Energy Office and its successor agency, the Federal Energy Administration,[41] have considered, investigated, or determined various aspects of plaintiffs' case; in particular, the Cost of Living Council has received justifications for the freeze period prices defendants

---

**38.** Under 10 CFR § 212.10, which sets out the general rules for 10 CFR Part 212, it states in (a): "*No firm* (including an individual) *may charge a price* for any covered product *which exceeds the maximum price* at which that product is permitted to be sold to the class of purchaser concerned under this part." (Emphasis added) 40 F.R. 60036 (December 31, 1975). But as issued and effective during the months of January and February, 1974, which are involved in this lawsuit, the regulation stated:

> § 210.10(a) *No firm* (including an individual) *may charge a price* with respect to any sale or lease of an item after January 15, [1974] *which exceeds the price permitted* under this part for that item. (emphasis added)

39 F.R. 1924 (January 15, 1974).

**39.** The plaintiffs' CPA admitted that plaintiffs' first exhibit showing defendants' overcharges, Exhibit 6 (Ex. pp. 131–134) overstated the overcharge due to the miscalculations of the $\frac{y}{x}$ factor of the formula. (T.R. p. 155). After the first exhibit was recalculated, the plaintiffs admitted that Exhibit 6A (Ex. pp. 136–140), as recalculated, grossly overstated the overcharge. (T.R. p. 359). In allocating the percentage of the overcharge paid by them, the plaintiffs had used their purchases against the defendants' total sales, rather than against the defendants' total sales of regular, premium, and diesel gasoline. (T.R. pp. 359, 424). Then the plaintiffs recalculated Exhibit 6A and introduced Exhibit 6B. (T.R. p. 592, Ex. pp. 168–170). See Note 9.

Plaintiffs not only had the benefit of hindsight in applying the formula (T.R. pp. 174–175) but also were able to use *actual* sales volumes for each month rather than the estimated sales figure defendants would have had to use during the period in controversy. The FEA has recognized that some inaccuracy will be present in the prices refiners charge based on the formula and has constructed the formula

> to provide a self-correcting mechanism for over and under recoupment of increased costs, in recognition of the fact that base price determinations in each month must necessarily rely on estimated sales volumes, which may turn out to be inaccurate.

*Phillips Petroleum Company*, Case No. FEA-0384 (filed 3–24–75, decided 5–30–75), 1975 CCH Energy Management Transfer Binder (2 FEA) ¶ 80,599, at p. 80,831.

**40.** The court stated:

> Maybe you ought to settle this case. Well, its certainly evident to me from the cross-examination that's been made that the defendants had a very good conception, or it would appear that they had a very good conception of what was going on in relation to these regulations. (T.R. p. 429).

**41.** The FEA, established by the Federal Energy Administration Act of 1974, 15 U.S.C. § 761 et seq. (1976 Supp.), succeeded the FEO and was empowered with all of the President's authority under the Allocation Act, pursuant to section 2(a) of Executive Order No. 11790, 39 F.R. 23185 (June 27, 1974).

charged their local jobbers (see T.R. p. 455 and Ex. p. 61); plaintiff Bill Shore was required to make refunds due to freeze period violations following an I.R.S. investigation of his freeze period charges and defendants' freeze period prices (T.R. pp. 302, 315–316); the defendants' Phase IV pricing formula calculations were examined by the I.R.S. (T.R. pp. 481–482); and the FEA issued a decision dealing with defendants' credit terms, *Crystal Oil Company*, FEA–0142 (filed 7–9–74, decided 10–8–74), 1974 CCH Energy Management Transfer Binder ¶ 20,161.

■ On remand, the district court should order the FEA, which has expertise and responsibility with respect to interpreting, applying, and enforcing the statutes and the pricing regulations in controversy, including corrective action for any unlawful price increase passed down the stream of commerce by a plaintiff,[42] to be joined as a party to this litigation. See this court's decisions in *Associated General Contractors v. Laborers Int. U. Local 612*, 476 F.2d 1388, 1405–1407 (Em.App.1973); *Air Products and Chemicals, Inc. v. United Gas Pipe Line Co.*, 503 F.2d 1060, 1062 (Em.App.1974).

If the parties fail to obtain the testimony of a witness from Petrofina to determine the truth regarding the existence of an agreement on June 4, 1973, between Longview and Petrofina to raise prices covering transactions occurring during the base period June 1 to June 8, 1973 (T.R. pp. 451, 453), also the testimony of Mr. Leeseman, the defendants' former accountant, regarding defendants' understanding and application of the pricing formula, the court may, in the interest of truth and justice, call and examine such witnesses. *Chalmette Petroleum Corp. v. Chalmette Distributing Co.*, 143 F.2d 826 (5 Cir. 1944).

Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

## APPENDIX A

**48,826**            *Phase IV Rules*            104  4-15-74

#### Subpart E—Refiners

**§ 212.81   Applicability.**

Except as provided in Subpart F, this subpart applies to each sale of a covered product which is purchased or refined by a refiner.

**§ 212.82   Price rule.**

(a) *Rule.* A refiner may not charge to any class of purchaser a price in excess of the base price of that covered product except to the extent permitted pursuant to the provisions of paragraphs (c) through (k) of this section.

(b) *Price increases.* (1) A price in excess of the base price of an item in a product line may be charged only to recover on a dollar-for-dollar basis those net increases in allowable costs that have been incurred with respect to the product line since the period for determining base cost and which the refiner continues to incur.

(2) For the purpose of determining whether net allowable costs have been incurred which permit the charging of a price in excess of the base price, base costs shall be compared with current costs. Current costs which exceed base costs may be used to justify a price in

---

**42.** See Note 38. Also, the general rules of 10 CFR Part 212 as in effect during the months relevant in this suit stated:

§ 212.10 GENERAL RULES.

.  .  .  (b) *No firm* (including an individual) *may knowingly pay a price* with respect to any sale or lease of an item which *exceeds* the price permitted under this part, for that item. However, *this paragraph does not apply to the sale or lease of an item* to any firm (including any individual) *under circumstances of economic* or other *coercion in which the buyer* or lessee, because of his need for that property or service, *had no reasonable alternative* but to pay the illegal price, *and he reports the sale or lease to the Federal Energy Office for investigation promptly.* (emphasis added)
39 F.R. 1924 (January 15, 1974). The current regulations, 10 CFR § 212.10(b) and (c) are to the same effect. 40 F.R. 60036 (December 31, 1975).

excess of the base price. "Allowable costs" under this section mean non-product costs attributable to refining operations under the customary accounting procedures generally accepted and historically and consistently applied by the firm concerned and exclude any costs attributable to marketing operations except as follows:

(i) Non-product costs attributable to the marketing of special products may be included as allowable costs to the extent that those costs allow an increase in the prices of special products above the prices otherwise permitted to be charged for such products pursuant to the provisions of this section by an amount not in excess of one cent per gallon with respect to retail sales and one half cent per gallon with respect to all other sales; and

(ii) Non-product costs per gallon of gasoline attributable to the retail marketing of gasoline may also be included as allowable costs to the extent that those costs per gallon of gasoline allow an increase in the price of gasoline above the prices otherwise permitted to be charged for gasoline pursuant to the provisions of this section, including paragraph (b)(2)(i) of this section by an amount not in excess of two cents per gallon with respect to retail sales; and

(iii) Beginning with April 1974, non-product costs attributable to the non-retail marketing of gasoline may be included as allowable costs to the extent that those costs allow an increase in the prices of gasoline above the prices otherwise permitted to be charged for such products pursuant to the provisions of this section including paragraph (b)(2)(i) of this section by an amount not in excess of one-quarter cent per gallon with respect to all sales other than retail sales; and

(iv) Beginning with April 1974, non-product costs attributable to the marketing of middle distillates may be included as allowable costs to the extent that those costs allow an increase in the prices of midde distillates above the prices otherwise permitted to be charged for such products pursuant to the provisions of this section including paragraph (b)(2)(i) of this section by an amount not in excess of one cent per gallon with respect to retail sales and not in excess of one-quarter cent per gallon with respect to all other sales; and

(v) Beginning with April 1974, non-product costs attributable to the marketing of residual fuel oil may be included as allowable costs to the extent that those costs allow an increase in the prices of residual fuel oil above the prices otherwise permitted to be charged for such products pursuant to the provisions of this section by an amount not in excess of three-fourths cent per gallon with respect to retail sales and one-fourth

cent per gallon with respect to all other sales; and

(vi) Beginning with April 1974, non-product costs attributable to the marketing of propane may be included as allowable costs to the extent that those costs allow an increase in the prices of propane above the prices otherwise permitted to be charged for such products pursuant to the provisions of this section by an amount not in excess of one cent per gallon with respect to retail sales and one-half cent per gallon with respect to all other sales.

(c) *Application of price increases.* (1) A firm may not increase prices above base prices pursuant to this section until it complies with the prenotification requirements of Subpart I of this part.

(2) A firm which is authorized to charge a prenotified percentage price increase pursuant to Subpart of this part with respect to a product line by virtue of cost justification determined in accordance with this section, shall apply that percentage price increase in the following manner: (i) A refiner may charge a price in excess of the base price of a special product which reflects that part of the total allowable percentage price increase with respect to the product line allocable to sales of that special product provided that (a) the amount of the increase above the base price is calculated by use of the formula in paragraph (c)(3)(i) of this section; (b) the amount of increased costs allocable to that special product is equally applied to each class of purchasers; and (c) the increase above the base prices may not be implemented more than once in any calendar month and must be implemented on the same date that increased product costs are added to May 15, 1973 selling prices to compute base prices pursuant to paragraph (f) of this section.

(ii) A refiner may charge a price in excess of the base price of its covered products other than special products which reflects that part of the total allowable percentage price increase with respect to the product line allocable to sales of those products or sales of special products not otherwise allocated pursuant to paragraph (c)(2)(i) of this section provided that (a) the amount of increase above the base price is calculated by use of the formula in paragraph (c)(3)(ii) of this section and (b) the amount of increased costs allocated to a covered product other than a special product is equally applied to each class of purchaser.

(3) *General formulae.* (i) For special products (i—1 and i—2):

$$d_i{}^* = \frac{S_i{}^* F}{V_i{}^*}$$

(ii) For covered products other than special products (i=3);

$$D_i{}^e = S_i{}^e F$$

**Where; for (i) and (ii):**

$d_i{}^e$ = The dollar amount that may be added to each base price of the special product or products of the type "i" in the period "e" (the consecutive twelve-month period). The formula for special products must be computed separately for i=1 (No. 2 heating oil and No. 2-D diesel fuel) and i=2 (gasoline).

$D_i{}^e$ = The total dollar amount a refiner may add in the period "e" (the consecutive twelve month period) to base prices of covered products of the type "i" in whatever amount it deems appropriate to each particular covered product other than a special product. The formula for covered products other than special products will only be computed for i=3 (all covered products other than special products and crude petroleum).

$V_i{}^e$ = Estimated volume or quantity of sales of a specific covered product of the type "i" in the period "e" (the consecutive twelve-month period).

$S_i{}^e$ = Estimated total revenues from sales for the period "e" (the consecutive twelve-month period), of a specific covered product or products of the type "i" at May 15, 1973 price levels.

$F$ = The percentage of cost-justification entered for all covered products under column (f), Item 24, Part VI of CLC Form 22.

The time period for measurement is referenced by the superscript e:

$e$ = The consecutive twelve-month period for which the cost-justification is proposed, commencing the first day following the accounting month most recently ended prior to the date of signing the prenotification CLC Form 22.

The type of covered product is referenced by the subscript i:

i=1 represents No. 2 heating oil and No. 2-D diesel fuel.
i=2 represents gasoline.
i=3 represents all covered products other than special products and crude petroleum.

(d) *Price reductions.* A price charged in excess of the base price may continue to be charged only as long as the net increases in allowable costs which support that price in excess of the base price continue to be incurred. Price reductions shall be made whenever and to the extent necessary to assure that, for any fiscal quarter, the weighted average of all price increases and price decreases in a product line does not exceed the percentage of cost justification for that line.

(e) *Productivity gains.* (1) Increases in allowable costs shall be reduced to reflect productivity gains. For the purpose of determining whether a price may be charged above a base price pursuant to this section, productivity gains shall be calculated on the basis of the average

percentage gain in the applicable industrial category, as set forth in the table in § 212.85. To the extent provided in the table in § 212.85 productivity gains shall be taken into account in the calculation of all price increases during any fiscal year but only until the full productivity offset, derived from the table and calculated under paragraph (e)(2) of this section, has been used within that fiscal year.

(2) For the purpose of determining the extent to which a price increase is justified, each refiner shall calculate the sum of all of its labor costs (of the type required to be included as costs in reporting and prenotification forms issued pursuant to Subpart I of this part) as a percentage of sales for the product line concerned, and shall multiply that percentage by the average annual rate of productivity gain for the applicable industrial category, as set forth in the table in § 212.85. The result is the productivity gain, stated as a percentage, by which the total cost increase must be reduced in order to be an allowable cost for the purposes of a price increase under this section.

(3) If the product line concerned extends to more than one industrial category, the average percentage gain in productivity in each category must be weighted in proportion to the ratio which its estimated sales in each industrial category for the most recently completed fiscal quarter bears to the total sales of that product line for that quarter.

(f) *Base price*—(1) *General rule.*

(i) The base price for sales of an item by a refiner is the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, plus increased product costs incurred between the month of measurement and the month of May 1973 and measured pursuant to the provisions of § 212.83. In computing the base price, a firm may not exclude any temporary special sale, deal or allowance in effect on May 15, 1973.

(ii) Notwithstanding the general rule in paragraph (f)(1)(i) of this section, with respect to an allocation sale made pursuant to § 211.186 of this chapter, the base price of a petrochemical feedstock (except benzene and toluene) is 115 percent of the price calculated pursuant to paragraph (f)(1)(i) provided that in the calculation of the increased product costs for petrochemical feedstocks in § 212.83, the refiner uses the formula for special products set forth in § 212.83(c)(2)(i).

(2) *Special products.*

(i) Notwithstanding the general rule in paragraph (f)(1) of this section, in computing the base price for special

products, a refiner may not increase its May 15, 1973 selling price to each class of purchaser more than once in any calendar month to reflect the increased product costs allowable pursuant to the provisions of § 212.83, but may implement the increase on any day during that month.

(3) *Benzene and toluene.* Notwithstanding the provisions of paragraph (f) (1) of this section, the base price for sales of benzene and toluene by a refiner is the weighted average price at which such an item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, plus increased product costs incurred between the month of measurement and the month of May 1973, and measured pursuant to the provisions of § 212.83, plus a maximum of $.337 per gallon for benzene, and $.288 per gallon for toluene.

(4) *Imputed prices.* If no transaction occurred with respect to a particular product on May 15, 1973, the most recent day preceding May 15, 1973 when a transaction occurred shall be used for purposes of computing the base price. If a refiner first offered an item for sale after May 15, 1973 and prior to the effective date of this paragraph, the first day when the item was offered for sale shall be used for purposes of computing the base price.

(5) *Special price rule for naphtha-base aviation fuel.* For purposes of computing the base price of naphtha-base aviation fuel pursuant to § 212.82(f), naphtha-base aviation fuel and kerosene-base aviation fuel shall be treated as a single item.

(g) *Base cost—*(1) *Base costs.* Base costs are the net allowable costs incurred with respect to the product line concerned and are calculated as follows:

(i) *Input costs.* The base cost with respect to costs of labor, crude petroleum and other input costs is the rate at which those costs were being incurred on May 15, 1973. If no input costs were incurred on that day, the base cost is the rate at which those costs were being incurred on the next day preceding May 15, 1973 on which input costs were incurred.

(ii) *All other costs.* The base cost with respect to all costs other than input costs is the rate at which those costs were being incurred on May 15, 1973. However, if the base cost with respect to any costs other than an input cost cannot reasonably be determined by the method prescribed in the preceding sentence, that base cost is the average cost incurred throughout the last fiscal quarter which ended before May 15, 1973, in which costs were incurred with respect to the product line concerned as calculated in accord-

ance with forms and instructions issued by the Federal Energy Office.

(2) *New items.* The base cost with respect to input costs for each new item, as defined in accordance with Subpart H, is calculated as of the date on which the new item concerned was first sold or leased in arms-length trading between unrelated persons. The base cost with respect to all other costs which cannot be calculated on the first day of sale is the average cost incurred throughout the fiscal quarter in which the new item concerned was first sold or leased in arms-length trading between unrelated persons.

(h) *Current cost—*(1) *Current costs.* Current costs are the net allowable costs incurred during the current cost period with respect to the item concerned excluding increased product costs incurred after May 15, 1973 and measured pursuant to § 212.83.

(2) *Input costs.* The current cost with respect to costs of labor, crude petroleum and other input costs is the rate at which those costs were being incurred on the last full day of business in the current cost period.

(3) *All other costs.* The current cost with respect to all costs other than input costs is the rate at which those costs were being incurred on the last full day of business in the current cost period. However, if the current cost with respect to all costs other than input costs cannot reasonably be determined by the method prescribed in the preceding sentence, that current cost is the average cost incurred throughout the current cost period with respect to those costs as calculated in accordance with forms and instructions issued by the Federal Energy Office.

(4) *Current cost period.* The current cost period is the last accounting month preceding the date of signature of the prenotification document submitted in accordance with Subpart I of this part except that with respect to input and other costs which may be calculated as of a date certain, the rate at which these costs are incurred on the day which is the date of signature of the prenotification document may be considered the rate on the last full day of the current cost period.

(i) *Profit margin limitation.* A refiner which charges a price for any item in excess of the base price for that item in any fiscal year may not for the fiscal year in which the price increase is charged, exceed its base period profit margin as defined in § 212.31.

(j) *Certification.* Each refiner of gasoline must, with respect to each sale of gasoline other than a retail sale, certify

in writing to the purchaser the octane number of the gasoline sold.

[As amended at 39 F. R. 4466, February 4, 1974; 39 F. R. 6533, February 20, 1974; 39 F. R. 7428, February 26, 1974; 39 F. R. 7581, February 27, 1974; 39 F. R. 7795, February 28, 1974; 39 F. R. 12010, April 2, 1974; 39 F. R. 12995, April 10, 1974.]

**§ 212.83   Allocation of refiner's increased product costs.**

(a) *Scope.* Except as provided in Subpart F this section prescribes the requirements governing the inclusion of a refiner's increased product costs in the computation of its base price pursuant to § 212.92(f) for covered products.

(b) *Definitions.* For purposes of this section—

"Cost of crude petroleum" means (1) For purposes of domestic crude petroleum, (a) in arms-length transactions, the purchase price provided that with respect to sales of crude petroleum subject to subpart L, it conforms with the requirements of that subpart; (b) in a transaction between affiliated entities, the posted price for the new crude petroleum and petroleum produce from stripper wells the first sale of which is exempt pursuant to § 212.54 and the posted price or price determined pursuant to § 212.74(b) for base production control level crude petroleum. If there is no posted price in a particular field, the related price for that grade of new domestic crude petroleum and petroleum produced from stripper wells which is most similar in kind and quality at the nearest field for which the price is posted and the price determined pursuant to § 212.74(b) for base production control level crude petroleum. Cost of crude petroleum also includes the cost of unfinished oils and natural gas liquids which are used in refining and are further refined, and which are covered products. The cost of domestic crude petroleum, unfinished oils and natural gas liquids includes transportation costs. (2) For purposes of imported crude petroleum, the lended cost.

"Cost of petroleum product" means (1) For purposes of domestic petroleum products other than crude petroleum, the purchase price including transportation costs. (2) For purposes of imported petroleum products other than crude petroleum, the landed cost.

"Firm" means a parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls.

"Increased product costs" means the sum of (1) the difference between the total cost of crude petroleum during the month of measurement and the total cost of crude petroleum during the month of May, 1973 plus (2) the difference between the total cost of petroleum product during the month of measurement and the total cost of petroleum product during the month of May, 1973. If a particular petroleum product was neither purchased nor landed during the month of May 1973, the cost of that petroleum product in May 1973 shall be imputed to be the lowest price at or above which at least 10% of that product was priced by the refiner in transactions during the month of May 1973.

"Landed cost" means: (1) For purposes of complete arms-length transactions, the purchase price at the point of origin plus the actual transportation cost. (2) For purposes of products purchased in arms-length transactions and shipped pursuant to a transaction between affiliated entities, the purchase price at the point of origin plus the transportation cost computed by use of the accounting procedures generally accepted and consistently and historically applied by the firm concerned. (3) For purposes of products purchased in a transaction between affiliated entities and shipped pursuant to an arms-length transaction, the cost of the product computed by use of the customary accounting procedures generally accepted and consistency and historically applied by the firm concerned plus the actual transportation cost. (4) For purposes of products purchased and shipped pursuant to a transaction between affiliated entities, the costs of the product and the transportation both computed by use of the customary accounting procedures generally accepted and consistently and historically applied by the firm concerned.

"Transactions between affiliated entities" means all transactions between entities which are part of the same firm and transactions with entities in which the firm has a beneficial interest to the extent of entitlement of covered product by reason of the beneficial interest.

**Stabilization Program Guidelines**

(c) *Allocation of increased-costs*—(1) *General rule*—(i) *Special products.* In computing base prices for sales of a special product, a refiner may increase its May 15, 1973 selling prices to each class of purchaser once each calendar month beginning with November 1973 by an amount to reflect the increased product costs attributable to sales of that special product using the differential between the month of measurement and the month of May, 1973 provided that the amount of increased costs used in computing a base price is calculated by use of the general formula set forth in paragraph (c)(2)(i) of this section. To the extent that a refiner does not allocate its increased product cost for a special product pursuant to this provision, it may include that part of its increased product costs attributable to sales of that special product in computing its base prices for covered products other than special products pursuant to paragraph (c)(1) (ii) of this section.

(ii) *Other than special products.* In computing base prices for a covered product other than a special product, a refiner may increase its May 15, 1973 selling price to each class of purchaser each month beginning with November 1973 by an amount to reflect the increased product costs attributable to sales of covered products other than special products or sales of special products not otherwise allocated pursuant to paragraph (c)(1)(i) of this section using the differential between the month of measurement and the month of May, 1973, provided that the amount of increased costs used in computing a base price is calculated by use of the general formula set forth in paragraph (c)(2) (ii) of this section and provide that the amount of increased product costs included in computing base prices of a particular covered product other than a special product must be equally applied to each class of purchaser. In apportioning any amount of increased product costs to covered products other than special products, a refiner may apportion the total amount of increased product costs to a particular covered product other than a special product in whatever amount he deems appropriate.

(iii) *Special propane rule.* Notwithstanding the provisions of § 212.83(c)(1) (ii) or § 212.83(d), in computing base prices for propane, a refiner may not, during any twelve month period following January 31, 1974, apportion to propane a greater percentage of the total amount increased product costs incurred during that period by that refiner than the percentage that the total sales vol-

ume of propane of that refiner is to the total sales volume of all covered products of that refiner during that twelve month period.

(2) *General formulae.* (i) For special products ($i=1$ and $i=2$):

$$d_i{}^u = \frac{A^i\left(\frac{V_i{}^n}{V^n}\right) + B_i{}^t + G_i{}^t - H_i{}^u}{V_i{}^u}$$

(ii) For covered products other than special products ($i=3$):

$$D_i{}^u = A^i\left(\frac{V_i{}^n}{V^n}\right) + B_i{}^t + G_i{}^t + H^u$$

Where; for (i) and (ii):

$d_i{}^u$ = The dollar increase that may be applied in the period "u" (the current month) to the May 15, 1973, selling price of the special product or products of the type "i" to each class of purchaser to compute the base price to each class of purchaser, except that the dollar increase that may be applied in the period "u" to the May 15, 1973, selling price of gasoline to compute the base prices to the classes of purchaser which purchase gasoline at retail from a refiner at service stations operated by employees of the refiner may be "$d_i{}^u$" plus a maximum of $.03 per gallon of gasoline provided that, in computing "$d_i{}^u$" the numerator of the formula in clause (i) of this subparagraph is reduced by an amount equal to the product of the actual amount of cents per gallon increase added to "$d_i{}^u$" above multiplied by the estimated number of gallons of gasoline to be sold during the period "u" at retail through service stations operated by employees of the refiner. The formula for special products must be computed separately for $i=1$ (No. 2 heating oil and No. 2-D diesel fuel) and for $i=2$ (gasoline).

$D^u_i$ = The total dollar amount a refiner may apportion in the period "u" (the current month) to covered products of the type "i" in whatever amounts it deems appropriate to each particular covered product other than a special product, provided that the total dollar amount is reduced by an amount equal to the total number of gallons of benzene and toluene sold by the refiner during the month of May 1973 multiplied by $.20 and further multiplied by an amount equal to the total number of barrels of refinery input to crude oil distillation units processed during the month of measurement and measured in accordance with Bureau of Mines form 6-1300-M divided by the total number of such barrels processed during the month of May 1973. The formula for covered products other than special products will only be computed for $i=3$ (all covered products other than a special product and crude petroleum).

$V^n$ = The total volume of all covered products sold in the period "n" (the consecutive three-month period of the

preceding year such that the middle month of the period corresponds to the current month "u").

$V_i{}^n$ = The total volume of a specific covered product or products of the type "i" sold in the period "n" (the consecutive three-month period of the preceding year such that the middle month of the period corresponds to the current month "u").

$V_i{}^u$ = The volume or quantity of a product or products of the type "i" estimated to be sold in the period "u" (the current month).

$$A^i = Q^i\left(\frac{C^t}{Q^t} - \frac{C^o}{Q^o}\right)$$

Which is the total increased cost of crude petroleum purchased or landed in the period "t" (the month of measurement).

Where:

$Q^t$ = The total quantity or volume of crude petroleum purchased in the period "t" (the month of measurement). For imported crude petroleum, the quantity or volume landed in the period "t" (the month of measurement).

$Q^o$ = The total quantity or volume of crude petroleum purchased in the period "o" (the month of May 1973). For imported crude petroleum, the quantity or volume landed in

$C^o$ = The total cost of crude petroleum purchased or landed in the period "o" (the month of May 1973).

$C^t$ = The total cost of crude petroleum purchased or landed in the period "t" (the month of measurement).

$$B_i{}^t = c_i{}^t - c_i{}^o - Y_i(q_i{}^t - q_i{}^o)$$

Which is the total increased cost of a specific covered product or products of the type "i" purchased or landed in the period "t" (the month of measurement).

Where:

$c_i{}^o$ = The total cost of a covered product or products of the type "i" purchased in the period "o" (the month of May 1973). For imported products, the cost of products of the type "i" landed in the period "o" (the month of May 1973).

$c_i{}^t$ = The total cost of a covered product or products of the type "i" purchased in the period "t" (the month of measurement). For imported products, the cost of products of the type "i" landed in the period "t" (the month of measurement).

$q_i{}^o$ = The total quantity or volume of a covered product or products of the type "i" purchased in the period "o" (the month of May 1973). For imported products of the type "i", the total quantity or volume landed in the period "o" (the month of May 1973).

¶ 48,821         

$q_i{}^t=$ The total quantity or volume of a covered product or products of the type "$i$" purchased in the period "$t$" (the month of measurement). For imported products of the type "$i$", the total quantity or volume landed in the period "$t$" (the month of measurement).

$Y_i=$ The lowest price at or above which at least 10% of the product or products of type "$i$" were priced in transactions during the month of May 1973 or, if none occurred in that month, in the month next preceding May 1973 in which such transactions occurred.

Alternatively, the cost of the product or products concerned during the month of May 1973 may be used if computed by use of accounting procedures generally accepted and consistently and historically applied by the firm concerned and provided that the FEO has approved in writing of the cost figures used.

$$G_i{}^t=J_i{}^t-K_i{}^t+L_i{}^t$$

Which is the total dollar amount of increased costs of the product or products of the type "$i$" not recovered in sales of that product through the period "$t$" (the month of measurement) that have been carried forward pursuant to paragraph (d) of this section or the total excess revenues derived from sales of the product or products of the type. "$i$" which must be subtracted pursuant to paragraph (d) of this section.

Where:

$J_i{}^t=$ The total dollar amount of increased product costs attributable to the product type "$i$" from August 1, 1973 through the period "$t$" (the month of measurement).

$K_i{}^t=$ The total dollar amount of increased product costs attributable to the product type "$i$" and recovered by sales through the period "$t$". (the month of measurement) by adjusting the May 15, 1973 selling prices pursuant to the provisions of this subpart.

$L_i{}^t=$ The total dollar amount of non-product costs attributable to includable amounts of commissions incurred during the period "$t$" (the month of measurement) beginning with April 1974 with respect to sales through consignee agents of the product or products of the type "$i$." The includable amount of commission incurred with respect to each item sold through each consignee agent is the dollar amount per unit of volume by which the commission in the period "$t$" (the month of measurement) exceeds the commission in effect on May 15, 1973, provided that the includable amount shall not exceed ten percent of the May 15, 1973 commission per unit of volume with respect to the sale of that item by that consignee agent.

$H_i{}^u=$ The portion of the total dollar amount available in the period "$u$" (the current month) for inclusion in price adjustments to special products of the type "$i$" which pursuant to paragraph (c)(1)(ii) of this section the refiner elects to include in prices of covered products other than special products for the period "$u$" (the current month).

$H^u=$ The sum of the dollar amounts available in the period "$u$" (the current month) for inclusion in price adjustments to specific products which pursuant to paragraph (c)(1)(ii) of this section the refiner elects to include in calculating the base prices of covered products other than special products for the period "$u$" (the current month).

The type of covered product is referenced by the subscript $i$:

$i=1$ represents No. 2 heating oil and No. 2-D diesel fuel.

$i=2$ represents gasoline.

$i=3$ represents all covered products other than special products and crude petroleum.

The time period for measurement is referenced in the superscript; where:

$n=$ The consecutive three-month period of the preceding year such that the middle month of the period corresponds to the current month.

$o=$ The month of May 1973.

$t=$ The month of measurement. (The month of measurement is the month preceding the current month.)

$u=$ The current month. Quantities calculated for the current month will be estimates which should be based on the best available data.

(d) *Carryover of costs.* (1) If in any month beginning with October 1973, a firm charges prices for a special product which result in the recoupment of less total revenues than the entire amount of increased product costs calculated for that product pursuant to the general formula and allowable under paragraph (c)(1)(i) of this section and that unused amount of increased costs is not used to increase May 15, 1973 selling prices pursuant to paragraph (c)(1)(ii) of this section, the amount of increased product cost not recouped may be added to the May 15, 1973 selling prices to compute the base prices for that special product for a subsequent month. The total amount allowable under paragraph (c)(1)(i) of this section may not include any amount represented by the symbol "H" in the formula in paragraph (c)(2)(i) of this section which pursuant to paragraph (c)(1)(ii) of this section the refiner has elected to include in a prior month in the calculation of the maximum permissible amount which may be

## 1032

used to adjust base prices of covered products other than special products. If in any month beginning with October 1973, a firm charges prices for a special product which result in the recoupment of more total revenues than the entire amount of increased product costs calculated for that product pursuant to the general formula and allowable under paragraph (c)(1)(i) of this section, the amount of excess product costs recouped must be subtracted from the May 15, 1973 selling prices to compute the base prices for that special product for the subsequent month.

(2) If, in any month beginning with October 1973, a firm charges prices for covered products other than special products which result in the recoupment of more or less total revenues than the entire amount of increased product costs calculated pursuant to the general formula and allowable under paragraph (c)(1)(ii) of this section, the excess revenues recouped must be subtracted from the May 15, 1973 selling prices and the amount of increased product costs not recouped may be added to May 15, 1973 selling prices to compute base prices for covered products other than special products in the subsequent month provided that the amount of the increased product cost not recouped and included in computing the base prices of a particular covered product other than a special product is equally applied to each class of purchaser. The total amount of increased product costs not recouped includes any amount represented by the symbol "H" in the formula in paragraph (c)(2)(ii) of this section which was available for inclusion in price adjustments to special products in a previous month and which the refiner elected pursuant to paragraph (c)(1)(ii) of this section to include in the calculation of the maximum permissible amount which may be used to calculate base prices for covered products other than special products.

(e) *Affiliated entities.* For purposes of this section, transactions between affiliated entities may be used to calculate increased product costs. Whenever a firm uses a landed cost which is computed by use of its customary accounting procedures, the FEO may allocate such costs between the affiliated entities if it determines that such allocation is necessary to reflect the actual costs of these entities or the FEO may disallow any costs which it determines to be in excess of the proper measurement of costs.

[As amended at 39 F. R. 4450, February 1, 1974; 39 F. R. 4466, February 4, 1974; 39 F. R. 7428, February 26, 1974; 39 F. R. 12012 and 12013, April 2, 1974.]

## [¶ 3427]
### § 212.84  Refiner's incentive factor.

[Deleted]

[As amended at 39 F. R. 7581, February 27, 1974.]

-- APPENDIX B --

As amended in 39 F.R. 809 (January 3, 1974), section 150.355 of 6 CFR read as follows:

[¶ 46,355]

§ 150.355   Price rule: Refiners.

[¶ 46,355.05]

(a) *Applicability.* Except as provided in § 150.359, this section applies to each sale of a covered product which is purchased or refined by a refiner.

[¶ 46,355.10]

(b) *Rule.* A refiner may not charge to any class of purchaser a price in excess of the base price of that covered product except to the extent permitted pursuant to the provisions of paragraphs (c) through (k) of this section.

[¶ 46,355.15]

(c) *Price increases.* (1) A price in excess of the base price of an item in a product line may be charged only to recover on a dollar-for-dollar basis those net increases in allowable costs that have been incurred with respect to the product line since the period for determining base cost and which the refiner continues to incur.

(2) For the purpose of determining whether net allowable costs have been incurred which permit the charging of a price in excess of the base price, base costs shall be compared with current costs. Current costs which exceed base costs may be used to justify a price in excess of the base price. "Allowable costs" under this section mean non-product costs attributable to refining operations under the customary accounting procedures generally accepted and historically and

**Stabilization Program Guidelines**                    § 150.355   ¶ 46,355

consistently applied by the firm concerned and exclude any costs attributable to marketing operations other than non-product costs attributable to the marketing of special products which may be included as allowable costs under this section to the extent that these costs allow an increase in the prices of special products above base prices by an amount not in excess of one cent per gallon with respect to retail sales and one half cent per gallon with respect to all other sales.

[¶ 46,355.20]

(d) *Application of price increases.* (1) A firm may not increase prices above base prices pursuant to this section until it complies with the prenotification requirements of Subpart H of this part.

(2) A firm which is authorized to charge a prenotified percentage price increase pursuant to Subpart H of this part with respect to a product line by virtue of cost justification determined in accordance with this section, shall apply that percentage price increase in the following manner: (i) A refiner may charge a price in excess of the base price of a special product which reflects that part of the total allowable percentage price increase with respect to the product line allocable to sales of that special product provided that (a) the amount of the increase above the base price is calculated by use of the formula in paragraph (d)(3)(i) of this section; (b) the amount of increased costs allocable to that special product is equally applied to each class of purchasers; and (c) the increase above the base prices may not be implemented more than once in any calendar month and must be implemented on the same date that increased product costs are added to May 15, 1973 selling prices to compute base prices pursuant to paragraph (g) of this section.

(ii) A refiner may charge a price in excess of the base price of its covered products other than special products which reflects that part of the total allowable percentage price increase with respect to the product line-allocable to sales of those products or sales of special products not otherwise allocated pursuant to paragraph (d)(2)(i) of this section provided that (a) the amount of increase above the base price is calculated by use of the formula in paragraph (d)(3)(ii) of this section and (b) the amount of increased costs allocated to a covered product other than a special product is equally applied to each class of purchaser.

(3) *General Formulae.*

(i) For special products (i = 1 and i = 2):

$$d_i^e = \frac{S_i^e F}{V_i^e}$$

(ii) For covered products other than special products (i = 3):

$$D_i^e = S_i^e F$$

Where; for (i) and (ii):

$d_i^e$ = The dollar amount that may be added to each base price of the special product or products of the type "i" in the period "e" (the consecutive twelve month period). The formula for special products must be computed separately for i = 1 (No. 2 heating oil and No. 2-D diesel fuel) and i =2 (gasoline).

$D_i^e$ = The total dollar amount a refiner may add in the period "e," (the consecutive twelve month period) to base prices of covered products of the type "i" in whatever amount it deems appropriate to each particular covered product other than a special product. The formula for covered products other than special products will only be computed for i = 3 (all covered products other than special products and crude petroleum).

$V_i^e$ = Estimated volume or quantity of sales of a specific covered product of the type "i" in the period "e" (the consecutive twelve-month period).

$S_i^e$ = Estimated total revenues from sales for the period "e" (the consecutive twelve month period), of a specific covered product or products of the type "i" at May 15, 1973 price levels.

F = The percentage of cost-justification entered for all covered products under column (f), item 24, Part VI of CLC Form 22.

The time period for measurement is referenced by the superscript e:

e = The consecutive twelve-month period for which the cost-justification is proposed, commencing the first day following the accounting month most recently ended prior to the date of signing the prenotification CLC Form 22.

The type of covered product is referenced by the subscript i:

i = 1 represents No. 2 heating oil and No. 2-D diesel fuel.

i = 2 represents gasoline.

i = 3 represents all covered products other than special products and crude petroleum.

[¶ 46,355.25]

(e) *Price reductions.* A price charged in excess of the base price may continue to be charged only as long as the net increases in allowable costs which support that price in excess of the base price continue to be incurred. Price reductions shall be made whenever and to the extent necessary to assure that, for any fiscal quarter, the weighted average of all price increases and price decreases in a product line does not exceed the percentage of cost justification for that line.

[¶ 46,355.30]

(f) *Productivity gains.* (1) Increases in allowable costs shall be reduced to reflect productivity gains. For the purpose of determining whether a price may be charged above a base price pursuant to this section, productivity gains shall be calculated on the basis of the average percentage gain in the applicable industrial category, as set forth in the table in the Appendix to Subpart E. To the extent provided in

¶ 46,355   § 150.355    Stabilization Program Guidelines

the table in the Appendix, productivity gains shall be taken into account in the calculation of all price increases during any fiscal year but only until the full productivity offset, derived from the Appendix and calculated under paragraph (f)(2) of this section, has been used within that fiscal year.

(2) For the purpose of determining the extent to which a price increase is justified, each refiner shall calculate the sum of all of its labor costs (of the type required to be included as costs in reporting and prenotification forms issued pursuant to Subpart H of this part) as a percentage of sales for the product line concerned, and shall multiply that percentage by the average annual rate of productivity gain for the applicable industrial category, as set forth in the table in the Appendix to Subpart E. The result is the productivity gain, stated as a percentage, by which the total cost increase must be reduced in order to be an allowable cost for the purposes of a price increase under this section.

(3) If the product line concerned extends to more than one industrial category, the average percentage gain in productivity in each category must be weighted in proportion to the ratio which its estimated sales in each industrial category for the most recently completed fiscal quarter bears to the total sales of that product line for that quarter.

[¶ 46,355.35]

(g) *Base price.* (1) *General rule.* (i) The base price for sales of an item by a refiner is the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, plus (A) increased product costs incurred between the month of measurement and the month of May 1973 and measured pursuant to the provisions of § 150.356 and (B) the refiner incentive factor calculated and permitted pursuant to the provisions of § 150.357. In computing the base price, a firm may not exclude any temporary special sale, deal or allowance in effect on May 15, 1973.

(ii) Notwithstanding the general rule in paragraph (g)(1)(i) of this section, in computing the base price for No. 1 heating oil, No. 4 fuel oil, Nos. 1-D and 4-D diesel fuel, kerosene and aviation turbine fuels, a refiner may, beginning with the month of January 1974, use adjusted May 15, 1973 selling prices. The adjusted May 15, 1973 price for No. 1 heating oil, No. 4 fuel oil, Nos. 1-D and 4-D diesel fuel, kerosene, and aviation turbine fuels, to each class of purchaser, is 2 cents plus the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973.

(2) *Special products.* (i) Notwithstanding the general rule in paragraph (g)(1) of this section, in computing the base price for special products for each month beginning with January 1974, a

refiner may use adjusted May 15, 1973 selling prices for No. 2 heating oil and No. 2-D diesel fuel, and must use adjusted May 15, 1973 selling prices for gasoline. In computing base prices for special products, a refiner may not increase its May 15, 1973 selling price to each class of purchaser more than once in any calendar month to reflect the increased product costs allowable pursuant to the provisions of § 150.356, the adjustment specified in paragraph (g)(2)(ii) of this section, or the incentive factor permitted pursuant to § 150.357, but may implement the increase on any day during that month.

(ii) The adjusted May 15, 1973 selling price for No. 2-D diesel fuel and No. 2 heating oil to each class of purchaser is 2 cents plus the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973. The adjusted May 15, 1973 selling price for gasoline to each class of purchaser is the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973 less the adjustment differential. The adjustment differential is computed by use of the following formula:

$$x = \frac{\$.02y}{z}$$

Where:

x = The adjustment differential; that amount which must be deducted from the weighted average unit price at which each item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973.

y = The total number of units of Nos. 1 and 2 heating oil, No. 4 fuel oil, Nos. 1-D, 2-D and 4-D diesel fuel, kerosene and aviation turbine fuel domestically produced by the refiner in May 1973.

z = The total number of units of gasoline domestically produced by the refiner in May 1973.

(3) *Imputed prices.* If no transaction occurred with respect to a particular product on May 15, 1973, the most recent day preceding May 15, 1973 when a transaction occurred shall be used for purposes of computing the base price. If a refiner first offered an item for sale after May 15, 1973 and prior to the effective date of this paragraph, the first day when the item was offered for sale shall be used for purposes of computing the base price.

[¶ 46,355.40]

(h) *Base cost.* (1) *Base costs.* Base costs are the net allowable costs incurred with respect to the product line concerned and are calculated as follows:

¶ 46,355   § 150.355        Stabilization Program Guidelines

(i) *Input costs.* The base cost with respect to costs of labor, crude petroleum and other input costs is the rate at which those costs were being incurred on May 15, 1973. If no input costs were incurred on that day, the base cost is the rate at which those costs were being incurred on the next day preceding May 15, 1973 on which input costs were incurred.

(ii) *All other costs.* The base cost with respect to all costs other than input costs is the rate at which those costs were being incurred on May 15, 1973. However, if the base cost with respect to any costs other than an input cost cannot reasonably be determined by the method prescribed in the preceding sentence, that base cost is the average cost incurred throughout the last fiscal quarter which ended before May 15, 1973, in which costs were incurred with respect to the product line concerned as calculated in accordance with forms and instructions issued by the Cost of Living Council.

(2) *New items.* The base cost with respect to input costs for each new item, as defined in accordance with § 150.361, is calculated as of the date on which the new item concerned was first sold or leased in arms-length trading between unrelated persons. The base cost with respect to all other costs which cannot be calculated on the first day of sale is the average cost incurred throughout the fiscal quarter in which the new item concerned was first sold or leased in arms-length trading between unrelated persons.

[¶ 46,355.45]

(i) *Current cost.* (1) *Current costs.* Current costs are the net allowable costs incurred during the current cost period with respect to the item concerned excluding increased product costs incurred after May 15, 1973 and measured pursuant to § 150.356.

(2) *Input costs.* The current cost with respect to costs of labor, crude petroleum and other input costs is the rate at which those costs were being incurred on the last full day of business in the current cost period.

(3) *All other costs.* The current cost with respect to all costs other than input costs is the rate at which those costs were being incurred on the last full day of business in the current cost period. However, if the current cost with respect to all costs other than input costs cannot reasonably be determined by the method prescribed in the preceding sentence, that current cost is the average cost incurred throughout the current cost period with respect to those costs as cal-

[The next page is 46,075-3.]

culated in accordance with forms and instructions issued by the Cost of Living Council.

(4) *Current cost period.* The current cost period is the last accounting month preceding the date of signature of the prenotification document submitted in accordance with Subpart H of this part except that with respect to input and other costs which may be calculated as of a date certain, the rate at which these costs are incurred on the day which is the date of signature of the prenotification document may be considered the rate on the last full day of the current cost period.

[¶ 46,355.50]

(j) *Profit margin limitation.* A refiner which charges a price for any item in excess of the base price for that item in any fiscal year may not for the fiscal year in which the price increase is charged, exceed its base period profit margin as defined in § 150.31 of this part.

[¶ 46,355.55]

(k) *Certification.* Each refiner of gasoline must, with respect to each sale of gasoline other than a retail sale, certify in writing to the purchaser the octane number of the gasoline sold.

Section 150.356 read as follows at 38 F.R. 22536 (August 22, 1973), until its amendment in 38 F.R. 25686 (September 14, 1973).

**"§ 150.356  Allocation of refiner's increased cost of imports.**

"(a) *Scope.* This section prescribes the requirements governing the inclusion of a refiner's increased costs of imports in the computation of its—

"(1) base prices for covered products; and

"(2) ceiling prices for retail sales of gasoline, No. 2-D diesel fuel, and No. 2 heating oil. This section does not apply to increased costs of imports of products a refiner resells as a refiner-reseller pursuant to § 150.359.

"(b) *Measuring amount of increased costs.* Except as used in paragraphs (e) and (f) of this section, "increased costs of imports" is the difference between the landed cost for the particular imported covered product and the landed cost on May 15, 1973, for that same grade of imported covered product from the same point of origin. For purposes of paragraph (e) and (f) of this section, "increased costs of imports" is the difference between the landed cost for the particular imported covered product on July 31, 1973, or if none was purchased on July 31, 1973, the next preceding day on which that imported covered product was landed and the landed cost on May 15, 1973, of the same grade of imported covered product from the same point of origin. In either case, if no covered product was landed on May 15, 1973 from the particular point of origin, the landed cost for May 15, 1973, shall be computed by reference to the posted or published price for that grade of imported covered product on May 15, 1973, at the point of origin plus transportation at world scale 160.

"(c) *Cost incurred before August 1, 1973: inclusion in base prices of covered products other than gasoline, No. 2-D diesel fuel or No. 2 heating oil.* Subject to the limitation of paragraph (g) of. this section, a refiner may, in computing its base prices for covered products (other than gasoline, No. 2-D diesel fuel, or No. 2 heating oil) pursuant to § 150.358(g), include an amount to reflect those increased costs of imports incurred between May 15, 1973, and August 1, 1973, which are attributable to imports of all covered products. To

the extent that a refiner does not allocate increased costs of imports pursuant to this paragraph, it may include that part of those increased costs of imports attributable to gasoline, No. 2-D diesel fuel, or No. 2 heating oil in computing its ceiling and base prices for those products pursuant to paragraph (d) of this section.

"(d) *Cost increases incurred before August 1, 1973: inclusion in ceiling and base prices of gasoline, No. 2-D diesel fuel, and No. 2 heating oil.* (1) Subject to the limitation of paragraph (g) of this section, a refiner may, in computing its ceiling prices for gasoline, No. 2-D diesel fuel, or No. 2 heating oil which it sells at retail as a refiner-retailer pursuant to § 150.355(c) and in computing its base prices for gasoline, No. 2-D diesel fuel, or No. 2 heating oil which it sells as a refiner pursuant to § 150.358(g), include an amount to reflect increased costs of imports of a covered product incurred between May 15, 1973, and August 1, 1973, which are attributable to that product and which have not been otherwise allocated pursuant to paragraph (c) of this section. A refiner may attribute a part of its increased costs of imports of covered products to gasoline, No. 2-D diesel fuel or No. 2 heating oil only if those imported covered products are refined by the refiner or co-mingled for accounting purposes with products refined by the refiner. In no case may the ratio that the attributed part bears to the total increased costs of imports exceed the ratio which sales during the corresponding fiscal quarter of the preceding year of the particular product receiving this allocation bear to the total sales of covered products during the same quarter.

"(2) A refiner which elects to include such costs in computing its ceiling prices and base prices for gasoline, No. 2-D diesel fuel and No. 2 heating oil must also allocate those costs between ceiling prices and base prices for the product concerned in accordance with the following rules.

"(i) The part of those costs allocated to the ceiling price of any product computed pursuant to § 150.355(c) may not exceed the proportion which the sales of that product at retail during the most recently completed fiscal quarter bears to the total sales of that product during the same quarter.

"(ii) The part of those costs allocated to base prices of any product computed pursuant to § 150.358(g) may not exceed the proportion which the sales of that product it sold as a refiner during the most recently completed fiscal quarter bears to total sales of that product during the same quarter.

"(e) *Cost incurred after July 31, 1973: inclusion in base prices of covered products other than gasoline, No. 2-D diesel fuel or No. 2 heating oil.* Subject to the limitation of paragraph (g) of this section, a refiner may, in computing its base prices for covered products (other than gasoline, No. 2-D diesel fuel, or No. 2 heating oil) pursuant to § 150.358 (g), include an amount to reflect increased costs of imports incurred after July 31, 1973, which are attributable to imports of all covered products. To the extent that a refiner does not allocate increased costs of imports pursuant to this paragraph it may include that part of its increased costs of imports attributable to gasoline, No. 2-D diesel fuel, or No. 2 heating oil in computing its base prices for those products pursuant to paragraph (f) of this section.

"(f) *Cost increases incurred after July 31, 1973: inclusion in base prices of gasoline, No. 2-D diesel fuel, and No. 2 heating oil.* (1) Subject to the limitation of paragraph (g) of this section, a refiner may, in computing its base prices for gasoline, No. 2-D diesel fuel, or No. 2 heating oil which it sells as a refiner pursuant to § 150.357, include an amount to reflect increased costs of imports incurred after July 31, 1973, which are attributable to that product and which have not been otherwise allocated pursuant to paragraph (e) of this section. A refiner may attribute a part of its increased costs of imports of covered products to gasoline, No. 2-D diesel fuel or No. 2 heating oil only if those imported covered products are refined by the refiner or commingled for accounting purposes with products refined by the refiner. In no case may the ratio that the attributed part bears to the total increased costs of imports exceed the ratio which sales during the corresponding fiscal quarter of the preceding year of the particular product receiving this allocation bears to the total sales of covered products during the same quarter.

"(2) A firm which elects to include such costs in computing its base prices for gasoline, No. 2-D diesel fuel, or No. 2 heating oil may only include that part of those costs which does not exceed the proportion which the sales of that product it sold as a refiner during the most recently completed fiscal quarter bears to total sales of that product during the same quarter. The part of those costs attributable to gasoline, No. 2-D diesel fuel, or No. 2 heating oil which the refiner sells in retail sales may not be included in the ceiling prices of any of those products or the base price of any covered product.

"(g) *General limitation.* The amount of increased costs of imports included in computing ceiling prices and base prices of a particular product must be equally applied to each class of purchasers of that product."

The following sections were amended at 38 F.R. 25686 (September 14, 1973), and read as below until their amendment in 38 F.R. 27290 (October 2, 1973).

"(a) *Scope.* This section prescribes the requirements governing (1) the inclusion of a refiner's increased costs of imports in the computation of its ceiling prices for retail sales of gasoline; No. 2-D diesel fuel, and No. 2 heating oil; and base prices for covered products; and (2) the inclusion of a refiner's increased costs of domestic crude petroleum and purchased domestic petroleum products commingled for accounting purposes in the computation of its base prices for covered products.

"This section does not apply to increased costs of imports and increased costs of domestic crude petroleum for products a refiner. resells as a refiner-reseller pursuant to § 150.359."

"(d) *Measurement of increased costs of imports for inclusion in computation of ceiling prices of special products.*

"(1) *Adjustment to May 15, 1973 selling price.* In computing its ceiling prices for a special product, a refiner may increase its May 15, 1973 selling price to each class of purchaser by an amount to reflect the increased costs of imported crude petroleum and imported special product attributable to retail sales of that special product using the differential between the month of July, 1973 and the month of May 1973.

"(2) *Subsequent adjustments to the ceiling price of No. 2 heating oil.* Notwithstanding the provisions of subparagraph (1), in computing the ceiling price for No. 2 heating oil, a refiner may, for any month subsequent to August 1973, increase its May 15 selling price to each class of purchaser by an amount to reflect the increased costs of imported crude petroleum using the differential between the month of July 1973 and the month of May 1973 and the increased costs of imported No. 2 heating oil using the differential between the preceding month and the month of May 1973, attributable to retail sales, provided that the refiner uses the amount derived from this computation in lieu of the amount calculated in subparagraph (1) of this paragraph. In computations pursuant to this subparagraph, the term $S^n_i$

$$\frac{S^n_i}{S^n_i}$$

should be computed as in subparagraph (1) of this paragraph to correspond with the month of July while the term $S^n_{ij}$

$$\frac{}{S^n_i}$$

should be computed to correspond to the appropriate month of measurement used for determining the increased costs of imported No. 2 heating oil."

"(c) *Allocation of increased costs*—(1) *General rule.* In computing its ceiling prices and base prices for covered products pursuant to §§ 150.355(c) and 150.358(g), a refiner may increase its May 15, 1973 selling prices to each class of purchaser on the first day of each month beginning with September 1973 by an amount to reflect the increased costs of imports and increased costs of domestic crude petroleum allowable under paragraphs (d), (e) and (f) of this section, provided that the amount of increased costs used in computing a ceiling price or base price is calculated by use of the general formula set forth in subparagraph (2). If, in any month beginning with September 1973, a firm establishes a base price for any covered product or a ceiling price for No. 2 heating oil which does not include the entire amount of increased costs calculated pursuant to this formula and allowable under paragraphs (d), (e) and (f) of this section for a particular item, the unused portion may be added to the May 15, 1973 selling price to compute the respective base price or ceiling price for a subsequent month."

"(c) (2) ...

"$t$ = The period of measurement. For ceiling prices other than No. 2 heating oil, $t$ = the month of July 1973.

"For ceiling prices of No. 2 heating oil, $t$ = the month of July 1973 as to costs derived from imported crude petroleum and the month of measurement for imported No. 2 heating oil. For base prices, $t$ = the month of measurement. (The month of measurement is the month preceding the current month).

"$n$ = The current month for base prices and ceiling price of No. 2 heating oil and the month of July, 1973 for the ceiling prices of gasoline and No. 2-D diesel fuel. Quantities calculated for the current month will be estimates which should be based on the best available data."

The following amendments were made in 38 F.R. 27290 (October 2, 1973).

In subsection (e) in 38 F. R. 27290, the date "October 1973" was substituted for the date "August 1973" and the date "September 30, 1973" was substituted for the date "July 31, 1973".

In subsection (f) in 38 F. R. 27290, the date "October 1973" was substituted for the date "Augsut 1973".

With the above amendments, §150.356 read as follows until amended at 38 F.R. 30267 (November 2, 1973).

"§ 150.356 Allocation of refiner's increased costs of imports and domestic crude petroleum.

"(a) *Scope.* This section prescribes the requirements governing the inclusion of a refiner's increased costs of imports and domestic crude petroleum in the computation of its ceiling prices for retail sales of gasoline; No. 2-D diesel fuel, and No. 2 heating oil; and base prices for covered products. This section does not apply to increased costs of imports and increased costs of domestic crude petroluem for products a refiner resells as a refiner-reseller pursuant to § 150.359.

"(b) *Definitions.* For purposes of this section—

"'Cost of domestic crude petroleum' means (1) For purposes of arms-length transactions the purchase price provided that it conforms with the requirements of § 150.354. (2) For purposes of a transaction between affiliated entities, the posted price for the new crude petroleum and the posted price or price determined pursuant to § 150.354(c)(3) for base production control level crude petroleum. If there is no posted price in a particular field, the related price for that grade of new domestic crude petroleum which is most similar in kind and quality at the nearest field for which the price is posted and the price determined pursuant to § 150.354(c)(3) for base production control level crude petroleum.

"'Firm' means a parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls.

"'Increased costs of domestic crude petroleum' means the difference between the total cost of domestic crude petroleum during the month of measurement and the total cost of domestic crude petroleum during the month of May. Increased costs of domestic crude petroleum also means the difference between the total cost of a purchased domestic petroleum product commingled for accounting purposes during the month of measurement and the total cost of that product commingled for accounting purposes during the month of May.

"'Increased costs of imports' means, for an imported product, the difference between the total landed cost for that product landed during the period of measurement and the total landed cost of that product landed during the month of May 1973.

"'Landed costs' means: (1) For purposes of complete arms-length transactions, the purchase price at the point of origin plus the actual transportation cost. (2) For purposes of products purchased in arms-length transactions and shipped pursuant to a transaction between affiliated entities, the purchase price at the point of origin plus the transportation cost computed by use of the accounting procedures generally accepted and consistently and historically applied by the firm concerned. (3) For purposes of products purchased in a transaction between affiliated entities and shipped pursuant to an arms-length transaction, the cost of the product computed by use of the customary accounting procedures generally accepted and consistently and historically applied by the firm concerned plus the actual transportation cost. (4) For purposes of products purchased and shipped pursuant to a transaction between affiliated entities, the costs of the product and the transportation, both computed by use of the customary accounting procedures generally accepted and consistently and historically applied by the firm concerned.

"'Special products' means gasoline, No. 2-D diesel fuel and No. 2 heating oil.

"'Transactions between affiliated entities' means all transactions between entities which are part of the same firm and transactions with entities in which the firm has a beneficial interest to the extent of entitlement of covered product by reason of the beneficial interest.

"(c) *Allocation of increased costs—* (1) *General rule.* In computing its ceiling prices and base prices for covered products pursuant to §§ 150.355(d) and 150.358(g), a refiner may increase its

May 15, 1973 selling prices to each class of purchaser each month beginning with November 1973 by an amount to reflect the increased costs of imports and increased costs of domestic crude petroleum allowable under paragraphs (d), (e) and (f) of this section; Provided, That the amount of increased costs used in computing a ceiling price or base price is calculated by use of the general formula set forth in subparagraph (2) of this paragraph. If, in any month beginning with November 1973, a firm establishes a base price for any covered product or a ceiling price for No. 2 heating oil which does not include the entire amount of increased costs calculated pursuant to this formula and allowable under paragraphs (d), (e) and (f) of this section for a particular item, the unused portion may be added to the May 15, 1973 selling price to compute the respective base price or ceiling price for a subsequent month.

For purposes of this subpart, transactions between affiliated entities may be used to calculate increased costs. Whenever a firm uses a landed cost which is computed by use of its customary accounting procedures, the Council may allocate such costs between the affiliated entities if it determines that such allocation is necessary to reflect the actual costs of those entities or the Council may disallow any costs which it determines to be in excess of the proper measurement of costs. Costs incurred in transactions in which covered products are obtained which are resold without being refined by the firm or commingled for accounting purposes may not be included in the calculation of the general formula.

(2) *General formula.*

$$D_{ij}^u = \frac{\left[ A \times \dfrac{S_i^n}{S^n} + B \right] \dfrac{S_{ij}^n}{S_i^n}}{q_{ij}^u}$$

Where—

D = The dollar increase that can be applied to each May 15, 1973 selling price of the covered product concerned to each class of purchaser to compute either the ceiling price or base price to each class of purchaser.

p = The unit price of a covered product other than crude petroleum. For imported products, the landed cost.

q = The quantity or volume of a covered product other than crude petroleum.

C = The unit cost of crude petroleum.

Q = The quantity or volume of crude petroleum.

S = $\displaystyle\sum_{i=1}^{4} \sum_{j=1}^{3} \left[ p_{ij}\, q_{ij} \right]$ which is the total sales of all covered products other than crude petroleum.

$S_i$ = $\displaystyle\sum_{j=1}^{3} \left[ p_{ij}\, q_{ij} \right]$ which is the total sales of a specific covered product or products other than crude petroleum.

$S_{ij} = p_{ij} q_{ij}$ which is the total sales of a specific covered product or products other than crude petroleum at a specific level of distribution. For ceiling prices, $j = 1$.

For base prices, $j = 2$ or $3$, as appropriate, for special products and $j = 1, 2$ or $3$ for other covered products.

$$A = \sum_k \left[ C_k^t Q_k^t - C_k^o Q_k^o - X^o \left( Q_k^t - Q_k^o \right) \right]$$

Where

$$X^o = \frac{\sum_{k=1}^{2} \left[ C_k^o Q_k^o \right]}{\sum_{k=1}^{2} \left[ Q_k^o \right]}$$ which is the average unit cost of crude petroleum. For ceiling price determinations, $K = 2$ except in computing $X^o$.

$$B = \sum_k \left[ p_{ik}^t q_{ik}^t - p_{ik}^o \cdot q_{ik}^o - Y^o \left( q_{ik}^t - q_{ik}^o \right) \right]$$

Where

$$Y^o = \frac{\sum_{j=1}^{3} \left[ p_{ij}^o q_{ij}^o \right]}{\sum_{j=1}^{3} \left[ q_{ij}^o \right]} - \frac{\sum_{j=1}^{2} \left[ p_{ij}^o q_{ij}^o \left( p_{ij}^o - p_{is}^o \right) \right]}{\sum_{j=1}^{2} \left[ p_{ij}^o q_{ij}^o \right]}$$

The type of covered product is referenced by the subscript $i$:

$i = 1$   represents No. 2 heating oil.
$i = 2$   represents gasoline.
$i = 3$   represents No. 2-D diesel fuel.
$i = 4$   represents all covered products other than special products.

The category of purchaser or level of distribution is referenced by the subscript $j$:

$j = 1$   represents sales to ultimate consumers.
$j = 2$   represents sales to retailers.
$j = 3$   represents sales to wholesalers.

The origin of a covered product is referenced by the subscript $k$:

$k = 1$   represents domestic origin.
$k = 2$   represents foreign origin or import.

*Superscripts*

$n =$ The fiscal quarter of the preceding year corresponding to the respective period of measurement.

$o =$ The month of May 1973.

$t =$ The period of measurement. For ceiling prices other than No. 2 heating oil, $t =$ the month of September 1973.

For ceiling prices of No. 2 heating oil and base prices, $t =$ month of measurement. (The month of measurement is the month preceding the current month.)

ᵘ — The current month for base prices and the ceiling price of No. 2 heating oil and the month of October 1973 for the ceiling prices of gasoline and No. 2-D diesel fuel. Quantities calculated for the current month will be estimates which should be based on the best available data.

*Mathematical Term*

$\Sigma$ Represents a calculation by summing with respect to the designated subscript all terms designated in the superscript.

"(d) *Measurement of increased costs of imports and domestic crude petroleum for inclusion in computation of ceiling prices of special products.*

"(1) *Adjustment to May 15, 1973 selling price.* In computing its ceiling prices for a special product, a refiner may increase its May 15, 1973 selling price to each class of purchaser by an amount to reflect the increased costs of imports and increased costs of domestic crude petroleum attributable to retail sales of that special product using the differential between the month of September, 1973 and the month of May 1973.

"(2) *Subsequent adjustments to the ceiling price of No. 2 heating oil.* Notwithstanding the provisions of subparagraph (1) of this paragraph in computing the ceiling price for No. 2 heating oil, a refiner may, for any month subsequent to October 1973, increase its May 15 selling price to each class of purchaser by an amount to reflect the increased costs of imports and domestic crude petroleum using the differential between the month of measurement and the month of May 1973, attributable to retail sales; Provided, That the refiner uses the amount derived from this computation in lieu of the amount calculated in subparagraph (1) of this paragraph.

"(e) *Measurement of increased costs of imports and domestic crude petroleum for inclusion in computation of base prices of covered products other than special products.* In computing base prices for a covered product other than a special product, a refiner may, for any month subsequent to October 1973, increase its May 15 selling price to each class of purchaser to reflect the increased costs of imports and the increased costs of domestic crude petroleum attributable to sales of covered products using the differential between the month of measurement and the month of May 1973, provided that the amount of increased costs included in computing base prices of a particular covered product other than a special product must be equally applied to each class of purchaser. To the extent that a refiner does not allocate increased costs pursuant to this paragraph, it may include that part of its increased costs attributable to special products in computing its base prices for those products pursuant to paragraph (f) of this section except that if any base price of a special product is increased pursuant to paragraph (f) then the part of increased costs attributable to retail sales of special products after September 30, 1973 may not be included in the ceiling price of No. 2 heating oil or the base price of any covered product.

"(f) *Measurement of increased costs of imports and domestic crude petroleum for inclusion in computation of base prices of special products.* In computing base prices for a special product, a refiner may, for any month subsequent to October 1973, increase its May 15 selling price to each class of purchaser by an amount to reflect the increased costs of imports and increased costs of domestic crude petroleum attributable to sales of that special product at other than retail using the differential between the month of measurement and the month of May 1973 provided that such increased costs have not been otherwise allocated pursuant to paragraph (e) of this section."

At 38 F.R. 30267 (November 2, 1973), §150.356 was amended to read as follows until amended in 38 F.R. 33577 (December 6, 1973).

"§ 150.356 Allocation of refiner's increased costs of imports and domestic crude petroleum.

"(a) *Scope.* This section prescribes the requirements governing the inclusion of a refiner's increased costs of imports and domestic crude petroleum in the computation of its base prices pursuant to § 150.355(g) for covered products, which it refines or commingles for accounting purposes with products it refines. This section does not apply to increased costs of imports and increased costs of domestic crude petroleum for products a refiner resells as a refiner-reseller pursuant to § 150.359.

"(b) *Definitions.* For purposes of this section—

" 'Cost of domestic crude petroleum' means (1) For purposes of arms-length transactions the purchase price: *Provided,* That it conforms with the requirement₋ of § 150.324. (2) For purposes of a transaction between affiliated entities, the posted price for the new crude petroleum and the posted price or price determined pursuant to § 150.354(c)(3) for base production control level crude petroleum. If there is no posted price in a particular field, the related price for that grade of new domestic crude petroleum which is most similar in kind and quality at the nearest field for which the price is posted and the price determined pursuant to § 150.354(c)(3) for base production control level crude petroleum.

" 'Firm' means a parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls.

" 'Increased costs of domestic crude petroleum' means the difference between the total cost of domestic crude petroleum during the month of measurement and the total cost of domestic crude petroleum during the month of May, 1973. Increased costs of domestic crude petroleum also means the difference between the total cost of a purchased domestic petroleum product commingled for accounting purposes during the month of measurement and the total cost of that product commingled for accounting purposes during the month of May, 1973.

" 'Increased costs of imports' means, for an imported product, the difference between the total landed cost for that product landed during the period of measurement and the total landed cost of that product landed during the month of May, 1973.

" 'Landed cost' means: (1) For purposes of complete arms-length transactions, the purchase price at the point of origin plus the actual transportation cost. (2) For purposes of products purchased in arms-length transactions and shipped pursuant to a transaction between affiliated entities, the purchase price at the point of origin plus the transportation cost computed by use of the accounting procedures generally accepted ad consistently and historically applied by the firm concerned. (3) For purposes of products purchased in a transaction between affiliated entities and shipped pursuant to an arms-length transaction, the cost of the product computed by use of the customary accounting procedures generally accepted and consistently and historically applied by the firm concerned plus the actual transportation cost. (4) For purposes of products purchased and shipped pursuant to a transaction between affiliated entities, the costs of the product and the transportation, both computed by use of the customary accounting procedures generally accepted and consistently and historically applied by the firm concerned.

" 'Transactions between affiliated entities' means all transactions between entities which are part of the same firm and transactions with entities in which the firm has a beneficial interest to the extent of entitlement of covered product by reason of the beneficial interest.

"(c) *Allocation of increased costs—*(1) *General rule.*

"(i) *Special products.* In computing base prices for sales of a special product at a particular level of distribution,

a refiner may increase its May 15, 1973 selling prices to each class of purchaser once each calendar month beginning with November 1973 by an amount to reflect increased costs of imports and increased costs of domestic crude petroleum attributable to sales of that special product at that level of distribution using the differential between the month of measurement and the month of May, 1973: *Provided,* That the amount of increased costs used in computing a base price is calculated by use of the general formula set forth in subparagraph (2) of this paragraph. To the extent that a refiner does not allocate its increased costs for a special product pursuant to this provision, it may include that part of its increased costs attributable to sales of that special product at that level of distribution in computing its base prices for covered products other than special products pursuant to subparagraph (1)(ii) of this paragraph.

(ii) *Other than special products.* In computing base prices for a covered product other than a special product, a refiner may increase its May 15, 1973, selling price to each class of purchaser each month beginning with November 1973 by an amount to reflect the increased costs of imports and increased costs of domestic crude petroleum attributable to sales of covered products other than special products or sales of special products not otherwise allocated pursuant to subparagraph (1)(i) of this paragraph using the differential between the month of measurement and the month of May, 1973, provided that the amount of increased costs used in computing a base price is calculated by use of the general formula set forth in subparagraph (2) of this paragraph: *And provided,* That the amount of increased costs included in computing base prices of a particular covered product other than a special product must be equally applied to each class of purchaser. In apportioning the total amount of increased costs allocable to covered products other than special products, a refiner may apportion the total amount of increased costs to a particular covered product other than a special product at a particular level of distribution in whatever amount he deems appropriate.

(2) *General formula.*

$$D_{ij}^n = \frac{\left[ A \times \dfrac{S_i^n}{S^n} + B \right] \dfrac{S_{ij}^n}{S_i^n}}{q_{ij}^n}$$

Where—

D — The dollar increase that can be applied to each May 15, 1973 selling price of the covered product concerned to each class of purchaser to compute the base price to each class of purchaser.

p — The unit price of a covered product other than crude petroleum. For imported products, the landed cost.

q — The quantity or volume of a covered product other than crude petroleum.

C = The unit cost of crude petroleum.

Q = The quantity or volume of crude petroleum.

$$S = \sum_{i=1}^{4} \sum_{j=1}^{3} \left[ p_{ij}\, q_{ij} \right]$$ which is the total sales of all covered products other than crude petroleum.

$$S_i = \sum_{j=1}^{3} \left[ p_{ij}\, q_{ij} \right]$$ which is the total sales of a specific covered product or products other than crude petroleum.

$S_{ij} = p_{ij}\, q_{ij}$ which is the total sales of a specific covered product or products other than crude petroleum at a specific level of distribution.

$$A = \sum_{k=1}^{2} \left[ C_k^t Q_k^t - C_k^o Q_k^o - X^o \left( Q_k^t - Q_k^o \right) \right]$$

Where $X^o = \dfrac{\sum_{k=1}^{2} \left[ C_k^o Q_k^o \right]}{\sum_{k=1}^{2} \left[ Q_k^o \right]}$ which is the average unit cost of crude petroleum.

$$B = \sum_{k=1}^{2} \left[ p_{1k}^t q_{1k}^t - p_{1k}^o q_{1k}^o - Y^o \left( q_{1k}^t - q_{1k}^o \right) \right]$$

Where $Y^o = \dfrac{\sum\limits_{j=1}^{3} \left[ p_{1j}^o q_{1j}^o \right]}{\sum\limits_{j=1}^{3} \left[ q_{1j}^o \right]} - \dfrac{\sum\limits_{j=1}^{2} \left[ p_{1j}^o q_{1j}^o \left( p_{1j}^o - p_{18}^o \right) \right]}{\sum\limits_{j=1}^{2} \left[ p_{1j}^o q_{1j}^o \right]}$

The type of covered product is referenced by the subscript $i$:

$i = 1$   represents No. 2 heating oil.

$i = 2$   represents gasoline.

$i = 3$   represents No. 2-D diesel fuel.

$i = 4$   represents all covered products other than special products.

The category of purchaser or level of distribution is referenced by the subscript $j$:

$j = 1$   represents sales to ultimate consumers.

$j = 2$   represents sales to retailers.

$j = 3$   represents sales to wholesalers.

The origin of a covered product is referenced by the subscript $k$:

$k = 1$   represents domestic origin.

$k = 2$   represents foreign origin or import.

*Superscripts*

n = The consecutive three-month period of the preceding year such that the middle month of the period corresponds to the current month.

o = The month of May 1973.

t = The month of measurement. (The month of measurement is the month preceding the current month.)

u = The current month. Quantities calculated for the current month will be estimates which should be based on the best available data.

*Mathematical Term*

Σ Represents a calculation by summing with respect to the designated subscript all terms designated in the superscript.

---

"(d) *Carryover of Costs.*

"(i) If in any month beginning with October 1973, a firm charges prices for a special product at a particular level of distribution which result in the recoupment of less total revenues than the entire amount of increased costs of imports and increased costs of domestic crude petroleum calculated for that product at that level of distribution pursuant to the general formula and allowable under paragraph (c)(1)(i) of this section and that unused amount of increased costs is not used to increase May 15, 1973, selling prices pursuant to paragraph (c)(1)(ii) of this section, the amount of increased costs not recouped may be added to the May 15, 1973, selling prices to compute the base prices for that special product at that level of distribution for a subsequent month. If in any month beginning with October 1973, a firm charges prices for a special product at a particular level of distribution which result in the recoupment of more total revenues than the entire amount of increased costs of imports and increased costs of domestic crude petroleum calculated for that product at that level of distribution pursuant to the general formula and allowable under paragraph (c)(1)(i) of this section, the amount of excess costs recouped must be subtracted from the May 15, 1973, selling prices to compute the base prices for that special product at that level of distribution for the subsequent month.

"(ii) If, in any month beginning with October 1973, a firm charges prices for covered products other than special products which result in the recoupment of more or less total revenues than the entire amount of increased costs of imports and increased costs of dometic crude petroleum calculated pursuant to the general formula and allowable under paragraph (c)(1)(ii) of this section, the excess revenue recouped must be subtracted from May 15, 1973, selling prices and the amount of increased costs not recouped may be added to May 15, 1973, selling prices to compute base prices for covered products other than special products in the subsequent month. *Provided,* That the amount of the unused costs included in computing the base prices of a particular covered product other than a special product is equally applied to each class of purchaser.

"(e) *Affiliated entities.* For purposes of this section transactions between affiliated entities may be used to calculate increased costs. Whenever a firm uses a landed cost which is computed by use of its customary accounting procedures, the Council may allocate such costs between the affiliated entities if it determines that such allocation is necessary to reflect the actual costs of those entities or the Council may disallow any costs which it determines to be in excess of the proper measurement of costs. Costs incurred in transactions in which covered products are obtained which are resold without being refined by the firm or commingled for accounting purposes may not be included in the calculation of the general formula."

(a) *Scope.* This section prescribes the requirements governing the inclusion of a refiner's increased product costs in the computation of its base prices pursuant to § 150.355(g) for covered products.

Subsections (b) thru (e) of §150.356 read as appears below in 38 F.R. 33577 (December 6, 1973). Subsection (a) in 38 F.R. 33577 read as appears above until amended in 38 F.R. 35473 (December 28, 1973), to read as appears below.

§ 150.356   Allocation of Refiner's increased product costs.

[¶ 46,356.05]

(a) *Scope.* Except as provided in § 150.359, this section prescribes the requirements governing the inclusion of a refiner's increased product costs in the computation of its base price pursuant to § 150.355(g) for covered products.

[¶ 46,356.10]

(b) *Definitions.* For purposes of this section—

"Cost of crude petroleum" means (1) For purposes of domestic crude peroleum, (a) in arms-length transactions, the purchase price provided that with respect to sales of crude petroleum subject to

subpart L, it conforms with the requirements of that subpart; (b) in a transaction between affiliated entities, the posted price for the new crude petroleum and petroleum produced from stripper wells the first sale of which is exempt pursuant to § 150.54(s) and the posted price or price determined pursuant to § 150.354(c)(3) for base production control level crude peroleum. If there is no posted price in a particular field, the related price for that grade of new domestic crude peroleum and petroleum produced from stripper wells which is most similar in kind and quality at the nearest field for which the price is posted and the price determined pursuant to § 150.354(c)(3) for base production control level crude petroleum. Cost of crude petroleum also includes the cost of unfinished oils and natural gas liquids which are used in refining and are further refined, and which are covered products. The cost of domestic crude peroleum, unfinished oils and natural gas liquids includes transportation costs. (2) For purposes of imported crude petroleum, the landed cost.

"Cost of petroleum product" means (1) For purposes of domestic petroleum products other than crude petroleum, the purchase price include transportation costs. (2) For purposes of imported petroleum products other than crude petroleum, the landed cost.

"Firm" means a parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls.

"Increased product costs" means the sum of (1) the difference between the total cost of crude petroleum during the month of measurement and the total cost of crude petroleum during the month of May, 1973 plus (2) the difference between the total cost of petroleum product during the month of measurement and the total cost of petroleum product during the month of May, 1973. If a particular petroleum product was neither purchased nor landed during the month of May 1973, the cost of that petroleum product in May 1973 shall be imputed to be the lowest price at or above which at least 10% of that product was priced by the refiner in transactions during the month of May 1973.

"Landed cost" means: (1) For purposes of complete arms-length transactions, the purchase price at the point of origin plus the actual transportation cost. (2) For purposes of products purchased in arms-length transactions and shipped pursuant to a transaction between affiliated entities, the purchase price at the point of origin plus the transportation cost computed by use of the accounting procedures

generally accepted and consistently and historically applied by the firm concerned. (3) For purposes of products purchased in a transaction between affiliated entities and shipped pursuant to an arms-length transaction, the cost of the product computed by use of the customary accounting procedures generally accepted and consistency and historically applied by the firm concerned plus the actual transportation cost. (4) For purposes of products purchased and shipped pursuant to a transaction between affiliated entities, the costs of the product and the transportation both computed by use of the customary accounting procedures generally accepted and consistently and historically applied by the firm concerned.

"Transactions between affiliated entities" means all transactions between entities which are part of the same firm and transactions with entities in which the firm has a beneficial interest to the extent of entitlement of covered product by reason of the beneficial interest.

[¶ 46,356.15]

(c) *Allocation of increased-costs—*(1) *General rule.*

(i) *Special products.* In computing base prices for sales of a special product, a refiner may increase its May 15, 1973 selling prices to each class of purchaser once each calendar month beginning with November 1973 by an amount to reflect the increased product costs attributable to sales of that special product using the differential between the month of measurement and the month of May, 1973 provided that the amount of increased costs used in computing a base price is calculated by use of the general formula set forth in paragraph (c)(2)(i) of this section. To the extent that a refiner does not allocate its increased product cost for a special product pursuant to this provision, it may include that part of its increased product costs attributable to sales of that special product in computing its base prices for covered products other than special products pursuant to paragraph (c)(1)(ii) of this section.

(ii) *Other than special products.* In computing base prices for a covered product other than a special product, a refiner may increase its May 15, 1973 selling price to each class of purchaser each month beginning with November 1973 by an amount to reflect the increased product costs attributable to sales of covered products other than special products or sales of special products not otherwise allocated pursuant to paragraph (c)(1)(i) of this section using the differential between the month of measurement and the month of May, 1973, provided that the amount of increased costs used in computing a base price is calculated by use of the general formula set forth in paragraph (c)(2)(ii) of this section and provide that the amount of increased product costs included in computing base prices of a particular covered product other than a special product must be equally

applied to each class of purchaser. In apportioning any amount of increased product costs to covered products other than special products, a refiner may apportion the total amount of increased product costs to a particular covered product other than a special product in whatever amount he deems appropriate.

(2) *General Formulae.*

(i) For special products (i = 1 and i = 2):

$$d_i^u = \frac{A^t \left[ \dfrac{V_i^n}{V^n} \right] + B_i^t + G_i^t - H_i^u}{V_i^u}$$

(ii) For covered products other than special products (i = 3):

$$D_i^u = A^t \left[ \dfrac{V_i^n}{V^n} \right] + B_i^t + G_i^t + H^u$$

Where; for (i) and (ii):

$d_i^u$ = The dollar increase that may be applied in the period "u" (the current month) to the May 15, 1973 selling price of the special product or products of the type "i" to each class of purchaser to compute the base price to each class of purchaser. The formula for special products must be computed separately for i = 1 (No. 2 heating oil and No. 2-D diesel fuel) and for i = 2 (gasoline).

$D_i^u$ = The total dollar amount a refiner may apportion in the period "u" (the current month) to covered products of the type "i" in whatever amounts it deems appropriate to each particular covered product other than a special product. The formula for covered products other than special products will only be computed for i = 3 (all covered products other than a special product and crude petroleum).

$V^n$ = The total volume of all covered products sold in the period "n" (the consecutive three-month period of the preceding year such that the middle month of the period corresponds to the current month "u").

$V_i^n$ = The total volume of a specific covered product or products of the type "i" sold in the period "n" (the consecutive three-month period of the preceding year such that the middle month of the period corresponds to the current month "u").

$V_i^u$ = The volume or quantity of a product or products of the type "i" estimated to be sold in the period "u" (the current month).

$$A^t = Q^t \left[ \frac{C^t}{Q_t} - \frac{C^o}{Q^o} \right]$$ which is the total increased cost of crude petroleum purchased or landed in the period "t" (the month of measurement).

Where:

$Q^t$ = The total quantity or volume of crude petroleum purchased in the period "t" (the month of measurement). For imported crude petroleum, the quantity or volume landed in the period "t" (the month of measurement).

$Q^o$ = The total quantity or volume of crude petroleum purchased in the period "o" (the month of May 1973). For imported crude petroleum, the quantity or volume landed in the period "o" (the month of May 1973).

$C^o$ = The total cost of crude petroleum purchased or landed in the period "o" (the month of May 1973).

$C^t$ = The total cost of crude petroleum purchased or landed in the period "t" (the month of measurement).

$$B_i^t = c_i^t - c_i^o - Y_i \left[ q_i^t - q_i^o \right]$$ which is the total increased cost of a specific covered product or products of the type "i" purchased or landed in the period "t" (the month of measurement).

Where:

$c_i^o$ = The total cost of a covered product or products of the type "i" purchased in the period "o" (the month of May 1973). For imported products, the cost of products of the type "i" landed in the period "o" (the month of May 1973).

$c_i^t$ = The total cost of a covered product or products of the type "i" purchased in the period "t" (the month of measurement). For imported products, the cost of products of the type "i" landed in the period "t" (the month of measurement).

$q_i^o$ = The total quantity or volume of a covered product or products of the type "i" purchased in the period "o" (the month of May 1973). For imported products of

the type "i", the total quantity or volume landed in the period "o" (the month of May 1973).

$q_i^t$ = The total quantity or volume of a covered product or products of the type "i" purchased in the period "t" (the month of measurement). For imported products of the type "i", the total quantity or volume landed in the period "t" (the month of measurement):

$Y_i$ = The lowest price at or above which at least 10% of the product or products of type "i" were priced in transactions during the month of May 1973 or, if none occurred in that month, in the month next preceding May 1973 in which such transactions occurred.

Alternatively, the cost of the product or products concerned during the month of May 1973 may be used if computed by use of accounting procedures generally accepted and consistently and historically applied by the firm concerned and provided that the Council has approved in writing of the cost figures used.

$G_i^t$ = $J_i^t - K_i^t$ which is the total dollar amount of increased costs of the product or products of the type "i" not recovered in sales of that product through the period "t" (the month of measurement) that have been carried forward pursuant to paragraph (d) of this section or the total excess revenues derived from sales of the product or products of the type "i" which must be subtracted pursuant to paragraph (d) of this section.

Where:

$J_i^t$ = The total dollar amount of increased product costs attributable to the product type "i" from August 1, 1973 through the period "t" (the month of measurement).

$K_i^t$ = The total dollar amount of increased product costs attributable to the product type "i" and recovered by sales through the period "t" (the month of measurement) by adjusting the May 15, 1973 selling prices pursuant to the provisions of this subpart.

$H_i^u$ = The portion of the total dollar amount available in the period "u" (the current month) for inclusion in price adjustments to special products of the type "i" which pursuant to subparagraph (c)(1)(ii) the refiner elects to include in prices of covered products other than special products for the period "u" (the current month).

$H^u$ = The sum of the dollar amounts available in the period "u" (the current month) for inclusion in price adjustments to special products which pursuant to paragraph (c)(1)(ii) of this section the refiner elects to include in calculating the base prices of covered products other than special products for the period "u" (the current month).

The type of covered product is referenced by the subscript i:

$i$ = 1 represents No. 2 heating oil and No. 2-D diesel fuel.

$i$ = 2 represents gasoline.

$i$ = 3 represents all covered products other than special products and crude petroleum.

The time period for measurement is referenced in the superscript; where:

n = The consecutive three-month period of the preceding year such that the middle month of the period corresponds to the current month.

o = The month of May 1973.

t = The month of measurement. (The month of measurement is the month preceding the current month.)

u = The current month. Quantities calculated for the current month will be estimates which should be based on the best available data.

[¶ 46,356.20]

(d) *Carryover of costs.*

(1) If in any month beginning with October 1973, a firm charges prices for a special product which result in the recoupment of less total revenues than the entire amount of increased product costs calculated for that product pursuant to the general formula and allowable under paragraph (c)(1)(i) of this section and that unused amount of increased costs is not used to increase May 15, 1973 selling prices pursuant to paragraph (c)(1)(ii) of this section, the amount of increased product cost not recouped may be added to the May 15, 1973 selling prices to compute the base prices for that special product for a subsequent month. The total amount allowable under (c)(1)(i) of this section may not include any amount represented by the symbol "H" in the formula in paragraph (c)(2)(i) of this section which pursuant to paragraph (c)(1)(ii) of this section the refiner has elected to include in a prior month in the calculation of the maximum permissible amount which may be used to adjust base prices of covered products other than special products. If in any month beginning with October 1973, a firm charges prices for a special product which result in the recoupment of more total revenues than the entire amount of increased product costs calculated for that product pursuant to the general formula and allowable under paragraph (c)(1)(i) of this section, the amount

of excess product costs recouped must be subtracted from the May 15, 1973 selling prices to compute the base prices for that special product for the subsequent month.

(2) If, in any month beginning with October 1973, a firm charges prices for covered products other than special products which result in the recoupment of more or less total revenues than the entire amount of increased product costs calculated pursuant to the general formula and allowable under paragraph (c)(1)(ii) of this section, the excess revenues recouped must be subtracted from the May 15, 1973 selling prices and the amount of increased product costs not recouped may be added to May 15, 1973 selling prices to compute base prices for covered products other than special products in the subsequent month provided that the amount of the increased product cost not recouped and included in computing the base prices of a particular covered product other than a special product is equally applied to each class of purchaser. The total amount of increased product costs not recouped includes any amount represented by the symbol "H" in the formula in paragraph (c)(2)(ii) of this section which was available for inclusion in price adjustments to special products in a previous month and which the refiner elected pursuant to paragraph (c)(1)(ii) of this section to include in the calculation of the maximum permissible amount which may be used to calculate base prices for covered products other than special products.

[¶ 46,356.25]

(e) *Affiliated entities.* For purposes of this section, transactions between affiliated entities may be used to calculate increased product costs. Whenever a firm uses a landed cost which is computed by use of its customary accounting procedures, the Council may allocate such costs between the affiliated entities if it determines that such allocation is necessary to reflect the actual costs of those entities or the Council may disallow any costs which it determines to be in excess of the proper measurement of costs.

## -- APPENDIX C --

## [¶ 13,851A]

### § 212.84   Refiner's incentive factor.

[New § 212.84 appears at ¶ 13,851; this § 212.84 was deleted in 39 F.R. 7581 (February 27, 1974).]

.01 *Historical record.*—Section 212.84 originated in 39 F. R. 1924 (January 15, 1974) and read as follows until it was deleted in 39 F. R. 7581:

"§ 212.84   Refiner's incentive factor.

"(a) *Scope.* This section sets forth an incentive plan designed to increase the yield of middle distillates by allowing an increase in May 15, 1973 selling prices for middle distillates in proportion to the increase in yield of middle distillate products.

"(b) *Applicability.* This section prescribes the requirements governing the inclusion of the incentive factor in a refiner's adjusted May 15, 1973 selling prices used to compute its base prices of middle distillates pursuant to § 212.82(f).

"(c) *Definition.* For purposes of this section—

" 'Adjusted base percentage distillate yield' means the higher of either (i) the base percentage distillate yield or (ii) the ratio which the maximum economic distillate production bears to estimated crude runs to stills in the current month.

" 'Base percentage distillate yield' means the ratio which the total number of barrels of middle distillates produced by the refiner in December 1973, bears to the refiner's total crude runs to stills in that month and expressed as a percentage.

" 'Base percentage yield' means the ratio which the total number of barrels of middle distillates plus gasoline produced by the refiner in December 1973 bears to the refiner's total crude runs to stills in that month and expressed as a percentage.

" 'Crude runs to stills' means the total barrels of refinery input to crude oil distillation units processed by the refiner and measured in accordance with Bureau of Mines form 6-1300-M.

" 'Crude capacity' means the operable refinery capacity of all of the refiner's refineries for the current month, expressed in terms of the maximum number of barrels of input to crude oil distillation units than can be processed during the current month, calculated and measured in accordance with the conditions and stipulations described in Bureau of Mines form 6-1300-M.

" 'Current month' means the calendar month in which the adjustment to May 15, 1973 selling prices are to be applied.

" 'Current percentage distillate yield' means the ratio which the estimated total number of barrels of middle distillates to be produced by the refiner in the current month bears to the refiner's total estimated crude runs to stills in the current month and expressed as a percentage.

" 'Current percentage yield' means the ratio which the estimated total number of barrels of middle distillate plus gasoline to be produced by the refiner in the current month bears to the refiner's total estimated crude runs to stills in the current month and expressed as a percentage.

" 'Maximum economic distillate production' means the total number of barrels of middle distillates that would have to be produced by the refiner in the current month (without any change in the base percentage yield) in order to maximize profits using May 15, 1973 selling prices plus the increased cost allowable in the period of measurement pursuant to § 212.83, and the adjustment to May 15, 1973 selling prices pursuant to § 212.82(f).

" 'Middle distillates' means Nos. 1 and 2 heating oils, Nos. 1-D, 2-D and 4-D diesel fuels, No. 4 fuel oil, kerosene and aviation turbine fuel.

" 'Percentage of refinery capacity operated' means the ratio which estimated

crude runs to stills bears to crude capacity in the current month.

" 'Residual fuel oil' means those fuel oils commonly known as Nos. 5 and 6 fuel oils, Bunker C and all other fuel oils which have a fifty percent boiling point over 700°F. in the ASTM D 86 standard distillation test.

"(d) *Rule*—(1) *Middle distillates.* In computing base prices under § 212.82(f) for middle distillates for a particular month beginning with January, 1974, a refiner whose current percentage distillate yield exceeds the adjusted base percentage distillate yield may add to the adjusted May 15, 1973 selling prices for each middle distillate a maximum amount determined according to the matrix in paragraph (d)(2) of this section; *Provided,* That (i) the refiner's current percentage yield is not greater than its base percentage yield and that (ii) if the application of the matrix in the current month would result in an increase in total revenues, the refiner must either (*a*) implement in the current month only that part of the amount shown on the matrix which does not result in an increase in the refiner's total revenues because of the application of the matrix, or (*b*) reduce the selling price of gasoline in the current month equally to each class of purchaser to the extent necessary to assure

that there is no increase in the refiner's total revenues because of the application of the matrix.

"(2) *Matrix.* The matrix shown below is the table to be used in applying the price rule of paragraph (d)(1) of this section. Application of the matrix may be illustrated as follows:

"Refiner R, operating at 73% of refinery capacity, produced a middle distillate yield during December 1973 of 24% of the total crude runs to stills. R's adjusted base percentage distillate yield is 27%. By January 1, 1974, R estimates an increase in production of middle distillate so that its 'current percentage distillate yield' is 30%.

"To determine the maximum allowable increase from the matrix which R may use in computing its base prices for January 1974, R first locates the entry corresponding to the percent of refinery capacity operated and moves across that row to the appropriate 'cell' for its adjusted base percentage distillate yield. R then continues along that

row horizontally, accumulating the value in each new "cell" entered until reaching the 'cell' located in the column corresponding to R's current percentage distillate yield. (R does not include the value shown in the starting 'cell', but does include the value shown in the ending 'cell'.) Using this method, R's computations are as follows:

"(1) Starting at row 'less than 80' under the caption 'percentage of refinery capacity operated', move to 'cell' at column '27' under the caption 'Percentage of distillate yield on crude runs to stills';

"(2) Move along that same row horizontally, accumulating the values shown:

.52¢ (or $.0052) (under column '28')
+ .50¢ (or $.0050) (under column '29')
+ .50¢ (or $.0050) (under column '30')

1.52¢ (or $.0152) per gallon = The maximum allowable incentive amount which R may use to compute January 1974 base prices for middle distillates."

INCENTIVE MATRIX—DISTILLATE PRODUCTION, ALLOWABLE INCREASES IN MAY 15 SELLING PRICES FOR REFINER'S DISTILLATE YIELDS

[Fraction of a cent per gallon]

| Percentage of refinery capacity operated | Percentage distillate yield on crude runs to stills | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 0 to 80 | 0.53 | 0.53 | 0.53 | 0.53 | 0.53 | 0.53 | 0.53 | 0.53 | 0.52 | 0.52 | 0.52 | 0.52 | 0.52 | 0.52 | 0.52 |
| 80 to 90 | .52 | .51 | .51 | .51 | .51 | .51 | .50 | .50 | .50 | .50 | .50 | .50 | .50 | .50 | .50 |
| 90 to 95 | .46 | .46 | .46 | .46 | .46 | .46 | .46 | .45 | .45 | .45 | .45 | .45 | .45 | .45 | .45 |
| More than 95 | .18 | .21 | .23 | .25 | .27 | .28 | .29 | .30 | .30 | .31 | .31 | .33 | .36 | .36 | .38 |

| | Percentage distillate yield on crude runs to stills | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 |
| 0 to 80 | 0.52 | 0.52 | 0.52 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.48 | 0.48 | 0.45 | 0.45 | 0.45 | 0.45 | 0.45 |
| 80 to 90 | .48 | .48 | .48 | .48 | .48 | .48 | .48 | .45 | .45 | .45 | .45 | .45 | .45 | .45 | .45 |
| 90 to 95 | .45 | .45 | .45 | .45 | .45 | .45 | .45 | .45 | .45 | .45 | .45 | .45 | .45 | .45 | .45 |
| More than 95 | .40 | .40 | .40 | .43 | .43 | .43 | .43 | .43 | .45 | .45 | .45 | .45 | .45 | .45 | .45 |